THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DAVID WOLFBRANDT, Defendant-Appellant.

Third District   No. 3—83—0328

━━━━━━━━

Opinion filed September 17, 1984.

Walter D. Braud, of Braud, Warner, Neppl & Westensee, Ltd., of Rock Island, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Sally L. Dilgart and Mark L. Rotert, Assistant Attorneys General, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

Following a jury trial, defendant, David Wolfbrandt, was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)), armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)), armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2) and conspiracy (Ill. Rev. Stat. 1981, ch. 38, par. 8—2). He and James Quirin had been previously indicted for these offenses by the grand jury of Warren County. The circuit court of Warren County sentenced defendant to concurrent terms of 70 years, 30 years, 30 years, and 3 years imprisonment in the Illinois Department of Corrections. James Quirin's conviction for conspiracy is not at issue in this appeal.

During the early morning hours of December 7, 1981, Warren County Deputy Sheriff George Darnell was dispatched to a bulk fuel storage plant near Monmouth, Illinois. A caller reported to the sheriff's department suspicious activity at the plant. Upon his arrival at the plant, Deputy Darnell radioed the dispatcher he would be out of his squad car because he observed a tanker either loading or unloading fuel. This was the last message received from the deputy.

Subsequently, a Monmouth city policeman was sent to the plant, where he saw a Warren County squad car with its lights on, the driver's side door open, and the engine running. The officer found the deputy's body lying face up in the grass about 8 to 10 feet from the squad car. The officer further observed that Darnell was dressed in a deputy sheriff's uniform and had a gun in his holster. It was later determined that Darnell was shot twice in the head, once in the chest, and once in the abdomen.

In January 1982, agents of the Illinois Department of Law Enforcement, Division of Criminal Investigation (DCI), received information that defendant was involved in thefts of fuel and may have been responsible for the shooting death of Deputy Darnell. Surveillance of defendant's home in Davenport, Iowa, and surveillance of his blue and white 1972 freightliner truck (vehicle) in Bettendorf, Iowa, was initiated by DCI agents with the knowledge of local law enforcement officials. On the evening of January 31, 1982, defendant was followed by two DCI agents and two Warren County deputy sheriffs. Subsequently, these officers witnessed defendant commit the theft of a

grain trailer in Washington County, Iowa. Agent David Reed and Deputy Don Breuer remained in Washington County to notify that county's sheriff, while Agent James Comrie and Deputy Gary Higbee pursued defendant. This pursuit led to Donnellson, Iowa, in Lee County. Reed and Breuer rejoined the pursuit and met Lee County Sheriff's Deputy Henshaw, who joined the pursuit. In Donnellson, the Illinois officials met with Lee County Sheriff Arnold, Deputy Henshaw, and a Donnellson city police officer. These officers decided to attempt an arrest of defendant for the trailer theft; however, defendant left Donnellson before the arrest could be made.

It was subsequently determined that defendant had entered the State of Missouri. Acting under the instructions of Sheriff Arnold, the officers again began the pursuit. Agent Comrie and Deputy Higbee located defendant near Taylor, Missouri, in Marion County. After requesting assistance from Missouri officers by radio, Comrie and Higbee placed defendant under arrest and held him until Sheriff Arnold and Missouri officers arrived. Defendant was advised of his constitutional rights and gave his name as David Hunter. A Sergeant Schroeder of the Missouri State Highway Patrol and Marion County Deputy Sheriff David Lovelace presented defendant with a printed Missouri consent-to-search form, which he subsequently signed. Lovelace and Corporal Gordon of the Missouri State Highway Patrol performed the search of defendant's vehicle. Two pairs of bolt cutters were seized from an unlocked toolbox attached to the rear of the truck. Defendant, at a subsequent suppression hearing, admitted ownership of these bolt cutters. Defendant was charged in Iowa with theft of the grain trailer, but these charges were later dismissed, and defendant was indicted in Warren County, Illinois, for the offenses of murder, armed robbery, armed violence and conspiracy. Trial commenced, and at its conclusion the jury returned a guilty verdict. Defendant has asked that we review numerous issues on appeal, and for the following reasons we affirm the decision of the circuit court.

The first issue on appeal is whether the trial court erred in denying defendant's motion to suppress physical evidence discovered during the search of his vehicle. Defendant first contends that the validity of the search must be resolved under Illinois law, citing *People v. Saiken* (1971), 49 Ill. 2d 504, 275 N.E.2d 381, and *People v. DeMorrow* (1974), 59 Ill. 2d 352, 320 N.E.2d 1, as authority for this proposition. We are not persuaded that these cases are determinative of the issue in question. Neither case involves the validity of an extraterritorial arrest and subsequent search. Both *Saiken* and *DeMorrow* held that the issues presented in their respective cases were evidentiary

and, therefore, procedural. As the court in *Saiken* stated, "[t]raditional conflict principles prescribe that issues of clearly procedural nature are governed by the internal laws of the forum, whereas substantive matters are controlled by the laws of the State where the transaction occurred." 49 Ill. 2d 504, 509, 275 N.E.2d 381, 385.

■ The United States Supreme Court has held that the question of reasonableness of a State search and seizure is governed by Federal constitutional standards as expressed in the fourth amendment and the decisions of the court in applying that amendment. (*Ker v. California* (1963), 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623.) According to *Miller v. United States* (1958), 357 U.S. 301, 2 L. Ed. 2d 1332, 78 S. Ct. 1190, and *United States v. Di Re* (1948), 332 U.S. 581, 92 L. Ed. 210, 68 S. Ct. 222, the validity of an arrest without a warrant is determined by the law of the State where the arrest took place. In accord with this ruling is *People v. Clark* (1977), 46 Ill. App. 3d 240, 360 N.E.2d 1160, where the court stated that "*** the validity of an arrest without a warrant for State offenses is determined by the law of the State in which the arrest occurred. ***" (46 Ill. App. 3d 240, 243, 360 N.E.2d 1160, 1163.) In the present case it is undisputed the arrest occurred in Missouri. We hold the substantive law of Missouri must be applied to determine the validity of defendant's arrest and the consequences of the arrest.

Defendant next contends that his arrest in Missouri was not justified under the doctrine or "fresh pursuit" or as a citizen's arrest. Generally, a peace officer is not granted the authority to make warrantless arrests outside of the political entity in which the officer serves, unless the officer is engaged in "hot" of "fresh pursuit" of a suspect. (See *People v. Clark* (1977), 46 Ill. App. 3d 240, 360 N.E.2d 1160.) The doctrine of "fresh pursuit" in Missouri is governed by the Uniform Fresh Pursuit Law. The pertinent Missouri statute allows any member of a duly organized peace unit of another State of the United States who enters Missouri and continues within Missouri in fresh pursuit of a person believed to have committed a felony in another State the same authority to arrest as any law enforcement official of Missouri. The statute also states that "[f]resh pursuit *** shall not necessarily imply instant pursuit, but pursuit without unreasonable delay." (Mo. Ann. Stat. sec. 544.155 (Vernon 1953).) Under Missouri law, therefore, the arrest of the defendant in the present case is valid if the arrest fits within the definition of "fresh pursuit" as determined by the circumstances of this particular case.

Here, the Illinois agents, while exercising surveillance over defendant in Iowa, witnessed him commit a felony. Clearly, the re-

quirement of probable cause to effect an arrest was satisfied under these circumstances. (See *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168; *Beck v. Ohio* (1964), 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223.) The felony was committed in Washington County, Iowa, and its sheriff's department requested the Illinois agents to assist in maintaining surveillance of defendant. The defendant continued driving and entered Lee County, Iowa, where the Lee County sheriff asked the Illinois agents to assist in making the arrest. Defendant, however, left the area before an arrest could be accomplished, and he subsequently entered Missouri. The Lee County, Iowa, sheriff and the Illinois officers pursued defendant, who was subsequently arrested in Marion County.

■ This arrest was valid because the requirements of the Missouri Fresh Pursuit Law were satisfied. The Illinois agents were members of a duly organized peace unit of another State who entered Missouri in fresh pursuit of a person known to have committed a felony in another State. This pursuit was carried out without unreasonable delay. Defendant argues that there was no fresh pursuit because he was not fleeing from his pursuers, and in fact, he was never aware of the officers behind him. We are not persuaded by this argument. Defendant is attempting to rely on the Illinois statutory definition of "fresh pursuit," which states, " 'Fresh pursuit' means the immediate pursuit of a person who is endeavoring to avoid arrest." (Ill. Rev. Stat. 1981, ch. 38, par. 107—4(a)(3).) While the Illinois fresh pursuit statute is not applicable to this case, even if it were, we believe that the phrase "endeavoring to avoid arrest" does not mean that a person must be consciously aware of the pursuit, but rather than a person is fleeing the scene of the crime to avoid arrest. Since we hold the arrest valid under the doctrine of fresh pursuit, it is not necessary to dispose of defendant's contention that the arrest was not justified as an arrest by a private citizen.

Defendant next contends the consent to search his vehicle was illegally obtained and was, therefore, invalid. According to *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041, a valid consent to search must be freely and voluntarily given, and not the result of duress or coercion. Defendant cites cases which describe various factors used by courts in considering all circumstances surrounding the consent to search. (See *e.g., United States v. O'Looney* (9th Cir. 1976), 544 F.2d 385; *United States v. Cepulonis* (1st Cir. 1976), 530 F.2d 238; *United States v. Rothman* (9th Cir. 1973), 492 F.2d 1260; *United States v. Mapp* (2nd Cir. 1973), 476 F.2d 67; *People v. Shaver* (1979), 77 Ill. App. 3d 709, 396 N.E.2d 643.)

While these cases are illustrative of factors which may be considered by a trial court in determining the validity of a consent to search, none support the defendant's claim his consent was involuntary as a matter of law.

■ A court of review will not disturb a trial court's decision on a suppression motion unless the trial court's finding was manifestly erroneous. (*People v. Long* (1983), 99 Ill. 2d 219, 457 N.E.2d 1252.) In the present case, defendant was given a printed Missouri consent-to-search form, which he signed. At the time he signed this consent he had already been advised of his constitutional rights. There were two officers present at the time of the signing, but neither had a weapon drawn. In fact, testimony of witnesses disclosed that no force, threats, or promises were made to defendant to obtain the consent. Based upon the circumstances of this case, the trial court's finding that defendant's consent to search his vehicle was freely given is supported by the evidence.

The second issue on appeal is whether the trial court erred in moving the place of trial. Pursuant to defendant's motion for change of venue, the place of trial was moved from Warren County to Hancock County. Defendant contends that once a change of venue is granted and a new location is selected, it should not be to a county where the opportunity to select an impartial jury is even less likely than from the county from which the case is removed. Defendant argues he received no fairer a trial in Hancock County than he would have received had the trial remained in Warren County, because both counties were nearly identical in population; there was no jury commission in Hancock County to screen initial veniremen; one out of four prospective jurors was prejudiced by what he or she had heard or read; younger jurors were not available in Hancock County; and Hancock County was the nearest county to where the deceased had spent much of his life and where the prosecutor had spent his early years.

If a trial court determines there exists in the county where the prosecution is pending such prejudice against the defendant that he cannot receive a fair trial, it shall transfer the cause to the circuit court in any county where a fair trial may be had. (See Ill. Rev. Stat. 1981, ch. 38, par. 114-6(c).) In selecting this circuit court, the determination of the impartiality of potential jurors rests within the sound discretion of the trial court. *People v. Strange* (1980), 81 Ill. App. 3d 81, 400 N.E.2d 1066.

■ In the present case, the trial judge removed the trial to Hancock County because of the popularity of the deceased in Warren County and not because of any pretrial publicity. Our review of the

facts fails to disclose any basis for reversing this decision. Furthermore, there is no evidence supporting defendant's other contentions. Thus, as we previously stated in *Strange*, "[a]ll of the jurors actually selected in this case stated they could render a fair and impartial verdict in accordance with the evidence presented in court. The trial court was satisfied with the truth of the jurors' statements, and we find no reason to differ with that judgment." (81 Ill. App. 3d 81, 84, 400 N.E.2d 1066, 1069.) We believe defendant was tried by a fair and impartial jury and the trial court's removal of the cause to Hancock County was within its discretion.

We next consider the issue of whether the trial court excused otherwise qualified jurors for cause without first establishing that they were so opposed to the death penalty that they would be unsuitable for jury duty. Defendant contends the majority of these juror discharges made for cause because of opposition to the death penalty were made by the court without consideration as to whether or not those prospective jurors could still follow the law and the court's instructions.

■ The discharge of prospective jurors under these circumstances is controlled by *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, where the Supreme Court held that prospective jurors could not be excused for cause simply because they had religious scruples against the infliction of the death penalty or voiced general objections to capital punishment. In a companion case, the court limited this holding to those circumstances in which the death penalty is actually imposed by the jury. (*Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788.) The issue of improper exclusion of prospective jurors under *Witherspoon* and *Bumper* involves only the sentence, not the conviction, and, therefore, the issue will only be considered on appeal if the death penalty is imposed. See *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.

■ Defendant next raises the issue of whether the trial court erred in refusing to accept defendant's waiver of a jury for the sentencing hearing tendered during *voir dire* examination of prospective jurors. This waiver applied only to sentence determination in the event defendant was found guilty. Defendant made no effort to waive a jury trial on the issue of his guilt or innocence. Defendant contends he tendered the waiver in order to secure jurors who could fairly decide the issue of his innocence or guilt when otherwise qualified and acceptable jurors were being excused solely because of their opposition to the death penalty.

Section 9—1(d) of the Criminal Code of 1961 states:

"(d) Separate sentencing hearing. Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in Subsection (b) and to consider any aggravating or mitigating factors as indicated in Subsection (c). The proceeding shall be conducted:

1. before the jury that determined the defendant's guilt; or

2. before a jury impanelled for the purpose of the proceeding if:

A. the defendant was convicted upon a plea of guilty; or

B. the defendant was convicted after a trial before the court sitting without a jury; or

C. the court for good cause shown discharges the jury that determined the defendant's guilt; or

3. before the court alone if the defendant waives a jury for the separate proceeding." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d).)

This section does not provide a specific time when a tender of the jury waiver is proper; however, the entire section speaks only in post-conviction terms. Under the language of this section, it would appear a waiver in advance of conviction in a jury trial is untimely made. While we are not unmindful of the strategic benefits which the defendant might think may arise from having his guilt or innocence decided by a jury not qualified to recommend the death penalty, it would appear this is not permitted by the statute.

The next issue is whether the prosecution concealed a composite drawing of the defendant to the prejudice of the defense. Barbara Allard reported to the sheriff of Warren County that she had seen "two strange men" who had frightened her on the night of Deputy Darnell's death. This incident occurred in the restaurant where she was working. On December 8, 1981, a DCI investigator prepared composite sketches of these men from descriptions provided him by Allard. Subsequently, on July 31, 1982, Allard saw a television news program which included a videotape of defendant appearing before the grand jury. Allard immediately recognized defendant as one of the men who had frightened her in the restaurant. She notified the DCI of this and later positively identified defendant from a photo array prepared for her.

Defendant contends the prosecution concealed these composite drawings. He argues that because he did not have possession of the drawings, he was unable to impeach Allard's testimony at the hearing to suppress her identification of him. This testimony placed defendant in the vicinity of the murder shortly before it occurred. Had defend-

ant been able to sufficiently impeach Allard, he argues, the trial court could have ruled as a matter of law that this identification was tainted and should not have been presented to the jury.

■ Our review of the record reveals that a pretrial discovery order was entered on October 15, 1982. On October 28, 1982, the prosecution filed a response to discovery motion, which stated on page 19 therein, "Two (2) composite drawings, drawn by S/A James Ezell." The hearing on defendant's motion to suppress identification testimony took place in February 1983. While defendant has cited cases reciting abstract propositions of law concerning the failure to disclose evidence (see *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; *People v. Vargas* (1983), 116 Ill. App. 3d 787, 452 N.E.2d 736; *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340; *People v. Bivins* (1981), 97 Ill. App. 3d 386, 422 N.E.2d 1044; *People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223; *People v. Stanbeary* (1970), 126 Ill. App. 2d 244, 261 N.E.2d 765), they are not applicable to the present case. The composite drawing was revealed to defendant prior to the suppression hearing and, therefore, defendant's argument is without merit.

We next consider whether the trial court erred in admitting evidence of other crimes. The prosecution during its case in chief presented evidence linking defendant to the thefts of fuel from various bulk storage plants. This evidence was admitted to show defendant's involvement in a conspiracy to commit theft and armed robbery.

The fuel thefts began in early July 1981 and culminated in the fuel theft the night Deputy Darnell was murdered. During this period, codefendant Quirin purchased only one-quarter of the amount of fuel that he had purchased during the first half of the year from his normal fuel suppliers. Defendant began delivering fuel to Quirin at the time of the first fuel theft and always at night. He was paid by checks which were recorded on Quirin's corporate books for "truck repairs" or for "salary"; however, Quirin admitted to his bookkeeper that a payment was really made for fuel. Defendant also charged telephone calls from the general area of the thefts to either his home or Quirin's business at the times of the thefts. Tire tracks made at the theft sites also matched the tires on defendant's vehicle and Quirin's tankers.

Defendant also purchased green petroleum dye, which is used to treat diesel fuel. A Quirin employee witnessed green and muddy-brown colors of diesel fuel in Quirin's fuel storage tanks. During one fuel theft, 150 tubes of grease were also taken. Seized during the execution of a search warrant at defendant's place of business were grease tubes and boxes bearing the same lot number as those stolen.

Finally, all thefts, phone calls, fuel deliveries and checks abruptly ceased following the December 7, 1981, fuel theft and murder. Defendant argues that these crimes were not identical to the crime charged, nor linked to him or even shown to be crimes.

The general rule is that evidence of the commission of other crimes, wrongs or acts committed by a defendant is inadmissible for the purpose of showing a disposition or propensity to commit crimes. (*People v. Wright* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) Such evidence is admissible, however, if relevant to show motive, knowledge, intent, absence of mistake or accident, identity, common scheme, plan or design, or *modus operandi*. (See *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) In determining whether to admit evidence of other crimes, courts must consider whether the evidence is so clearly connected with the main issue that it tends to prove the accused guilty of the crime for which he is being tried. (*People v. Cross* (1981), 96 Ill. App. 3d 268, 421 N.E.2d 262.) The probative value of this evidence must then be balanced against and outweigh the degree of prejudice that will result from its admission. *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

■ In the present case, the evidence presented established a link between defendant and the thefts of fuel from the bulk storage plants. Proof of other crimes need not be beyond a reasonable doubt (*People v. MacRae* (1977), 47 Ill. App. 3d 302, 361 N.E.2d 685); yet, it must be more than mere suspicion. (*People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155.) A review of the evidence discloses it to be highly probative on the issues of intent, common scheme or plan and *modus operandi* and tended to prove defendant's guilt. The probative value of such evidence outweighs any prejudice therein and, accordingly, was properly admitted. (See *People v. Wilson* (1970), 46 Ill. 2d 376, 263 N.E.2d 856; *People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347.) Furthermore, the jury was given a limiting instruction as to the evidence of other crimes. This instruction substantially reduced any prejudicial impact which may have resulted by virtue of the admission of such evidence. See *People v. Kirkwood* (1980), 82 Ill. App. 3d 252, 402 N.E.2d 677.

Defendant has raised the issue of possible instances of error which cumulatively deprived him of a fair trial. These include police and prosecution misconduct, incorrect jury instructions, improper closing argument, and verdicts contrary to the manifest weight of the evidence. We have reviewed these alleged errors and find no support for defendant's contentions. To discuss the alleged errors at length would unduly add to the length of this opinion, which we believe is unneces-

sary in view of the lack of substance to such contentions of error.

The final issue on appeal is whether the sentences imposed were excessive. Defendant contends the mitigating factors present warrant a reduction of the sentences imposed, *i.e.*, no serious prior record, a Christian upbringing, a hard-working, nondrinking personal life, and close family ties.

■ Supreme Court Rule 615(b)(4) (87 Ill. 2d R. 615(b)(4)) allows a reviewing court to reduce sentences; however, this alteration of the sentencing judge's disposition may be done only upon a finding of an abuse of discretion. (*People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The record shows the sentencing judge reached his decision only after considering the nature and circumstances of the offense and other proper factors bearing upon the sentence. No reasons have been presented to disturb the discretion vested in the trial court to impose these sentences.

Accordingly, for the reasons set forth in this opinion, the judgment of the circuit court of Warren County is affirmed.

Affirmed.

HEIPLE and SCOTT, JJ., concur.