THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE NEARN, SR., *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 86—0689, 86—0858 cons.

Opinion filed December 30, 1988.

Michael J. Pelletier and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Marie Quinlivan Czech, and Michael Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

Willie Nearn, Sr., Ronald Norton and Willie Nearn, Jr., were indicted for criminal damage to the property of Rose Rolek (Rolek), conspiracy to commit criminal damage to property of Rolek and conspiracy to commit theft from Rolek. Willie Nearn, Sr. (Nearn), was tried by a jury, and Ronald Norton (Norton) and Willie Nearn, Jr., were tried by the court. The court found Willie Nearn, Jr., not guilty and Ronald Norton guilty; the jury found Willie Nearn, Sr., guilty. The trial judge merged the offenses of criminal damage to property and conspiracy to commit criminal damage to property and sentenced Nearn to a concurrent six-year term of imprisonment and fined him $2,595. He sentenced Norton to a four-year term and fined him $795.

Although the defendants raise no question about the sufficiency of the evidence, a recitation of a substantial part of the evidence is required for an understanding of Nearn's argument that certain evidence was inadmissible.

The defendants were convicted of what is commonly referred to as home repair fraud, consisting of sabotaging a home's sewer system and then charging the elderly owner an exorbitant fee for replacing the system.

Arthur LaGace testified pursuant to a plea agreement. He was a former police officer and in 1982 pleaded guilty to auto theft and bond jumping and was sentenced to 3½ years' imprisonment. Before and after his release from prison in 1983 he worked in the air-conditioning business. In July 1984, he was working at Supreme Heating, allegedly owned by Nearn and Peter Lewis. Supreme Heating was located at 6015 West Belmont. Although he had not worked for Nearn until this time, he knew that Nearn was the owner of Central Heating and Air-Conditioning located at 4842 West Diversey Avenue in Chicago.

In early July 1984, there was a meeting at Supreme Heating with him, his brother William, Nearn, Norton, Bob Mathis and Debbie Moorman. Nearn stated that "we were going into the plumbing business." Nearn also said there would be certain "special customers" who would be charged between $20,000 and $50,000. The plan in-

volved deliberate sabotage of the sewer system, digging up the basement floor and selling the customer a complete sewer line.

LaGace was to be the "set man," a person who goes to the premises, finds a problem or creates one and then calls the "closer." A "closer" is the salesman who explains the problem to the customer, arranges the contract and collects the money. Nearn and Lewis agreed to split the jobs equally, one job would be closed by Mathis and the other by Norton. Mathis had worked for Nearn at Central Heating and came with him to Supreme Heating. At the time of the meeting, Norton was working for both Nearn and Lewis but had previously been working just for Lewis. All present participated in the discussion; Norton asked who the "closer" would be. When LaGace told those present he did not know anything about plumbing and, therefore, did not know how to sabotage a system, Mathis explained that all he had to do was drop a few pieces of wood down a roof stack pipe and that would do the job.

A few days after this meeting Nearn told Norton and LaGace that Central Heating contracts should be used for the jobs. Later, at another meeting at Supreme Heating's office, Nearn told LaGace that stuffing garbage bags into the clean-out drain would cause the toilet to overflow and that this method was to be used if the board-down-the-pipe method was not available.

On September 6 or 7, 1984, LaGace and his brother William went to the residence of Rolek. After cleaning the furnace he told her that repairs were needed to her chimney flue pipe and that he would have to come back the next day, because he did not have cement with him.

On Saturday, September 8, LaGace stopped at the Supreme Heating office and told Norton to be available because he (LaGace) was going to "set" the job. That arrangement had been discussed between them several days before. LaGace and his brother William then returned to Rolek's home with cementing equipment, a wrench and garbage bags, and began mixing cement in the basement. When Rolek told them that her toilet did not flush properly, LaGace and Rolek went upstairs to look. LaGace told his brother that he was going to the store to buy a part for the toilet and instructed him to stuff the plastic garbage bags down the clean-out drain. Before leaving, LaGace called Norton at Supreme Heating and told him that the job was ready and to come over to the Rolek home.

When he returned from the store, LaGace attempted to repair the toilet, but it overflowed. LaGace called Supreme Heating and was told that Norton was en route. Norton arrived about 30 minutes later and introduced himself as "Stan, the plumber." Norton instructed LaGace

to jam some clay, which had been saved from a previous job, into the three-inch floor drain and pour water over the basement floor. Norton then showed Rolek the basement floor, told her that the tiles were broken and that the floor would have to be torn up to make repairs. Norton filled out a blank order form and wrote in the name of Central Heating on the top. The order stated that the job cost $50,000. Norton had to "brow beat" Rolek into signing the order. Norton signed it as "Stan Lubanski." (A handwriting expert of the Chicago police department would later testify by stipulation that Norton wrote and signed the order.) A work crew arrived and began breaking open the floor. The garbage bags were removed from the drain.

On Monday, September 10, at the Supreme Heating offices, La-Gace heard Norton tell Peter Lewis that he did not want to go back to Rolek's home and have her sign a contract or to pick up the money; Norton asked Don Wennersten, an installer, to do it.

Rolek testified that she was 82 years old. Her building is a two-flat; she lives on the first floor and her sister-in-law on the second. She testified to prior contracts she had with Central Heating, such as the purchase of three furnaces, two within a three-year period, the purchase of a hot water heater, and electrical wiring and foundation work done to repair an alleged structural deficiency. She did not testify that she was not satisfied with any of the work performed with the exception of some attic work. She said that LaGace represented that he was a police officer/building inspector who came to inspect her furnace. She identified the work order that Norton persuaded her to sign.

The following Monday she went to Citicorp Savings and obtained a $25,000 check for down payment on the plumbing job. While there she had a conversation with Joyce Narducy, a Citicorp employee, and told her that she needed the money as a down payment for a plumbing job. Narducy alerted James Ryan, a Chicago police officer and Citicorp security guard, who then notified the Chicago police department.

The police went to the Rolek home to investigate and eventually placed eight persons under arrest. They were the seven workmen who were in the basement digging up the floor and Don Wennersten, who arrived later with the formal contract. He was to get Rolek's signature on the contract and collect the fee.

A plumbing expert, George Holmes, testified that he went to the Rolek home to examine the basement. His company replaced her entire sewer system at a cost of $1,700 to $1,800, and he estimated that a complete system would cost between $3,000 and $4,200.

Pauline McCormick, a former Central Heating employee, testified under a grant of immunity. Her duties included answering telephones and filling out work orders and customer order cards. She made some of the entries on Rolek's card at Central Heating. In the summer of 1984 she was employed by Supreme Heating. Nearn told her that he and Lewis were going to be partners. On or about September 8, she overhead LaGace and others laughing about the Rolek job. On September 10, she overheard Nearn ask Wennersten to "do him a favor." Later that same day Wennersten called her from jail and asked her to tell Nearn that arrests had been made on the Rolek job. She also testified that, at Nearn's request, she wrote and endorsed checks for Central Heating while working at Supreme Heating.

Fred Frankston, an employee of Parkway Bank and Trust Company, testified that his record showed that Nearn was the sole owner of Central Heating. He also testified that a check drawn on the Central Heating account was made out to "Stan Lubanski" on September 7 and was subsequently cashed at a currency exchange.

Don Wennersten also testified under a grant of immunity. He had been a friend of Nearn's since 1969 and worked for him since 1978 or 1979 up to September 1983. He had known Norton for 14 to 15 years. On September 8, Nearn told him he would have work for him on Monday, September 10. On that date Norton asked Wennersten to do him a favor and get the Rolek contract signed and to pick up the payment. Wennersten saw Norton sign "Stan Lubanski" on a Central Heating contract for Rolek. When he arrived at the Rolek home the police were there. He did not give the contract to the police; instead, he placed it in his shoe, where it remained until after he got out of jail that evening. The next day he went back to the Supreme Heating office and returned the contract. He also testified that Norton worked for Nearn on a job-by-job basis.

Debbie Moorman testified that she was present at the July 1984 meeting, and her testimony generally agreed with that of LaGace. She admitted that she told the grand jury that she did not know who "Stan Lubanski" was, although she testified at trial that Lubanski was Norton. Nearn had threatened to kill her if she testified before the grand jury.

James Duncan, Nearn's nephew, testified that he had worked for Nearn as a set man and closer although he had no experience in the home repair field. On September 10, Nearn told his son to go to the Rolek home "to see how the job was going as planned." Duncan helped both the father and son load up equipment and went with the son to the Rolek home. He was working with the other workmen tear-

ing up the basement floor when the police arrived, and he was placed under arrest.

Mary Stynoski, a former Central Heating employee, testified that a loose-leaf book was compiled with a list of potential customers obtained from a home improvement show. The letter "M," for "Mope," was added to designate persons who could be sold something more easily than others. All persons in the office, including Nearn, used the designation. She also testified that the file cards revealed that some customers had been sold multiple furnaces within a five-year period.

A currency exchange operator, Frank Tufano, testified that Nearn and Peter Lewis made check-cashing arrangements for Supreme Heating in the summer of 1984. They told Tufano that they were going to be partners.

We will first consider the claim that the judge improperly admitted proof of another crime. Before trial began the State moved for admission of two transactions involving contracts with other persons, Henry Lang and Ruth and Loretta Crigley. The judge denied the State's motion with the reservation that the State could renew its motion before it rested. The State did renew its motion after all testimony had been received concerning the Rolek contract and the judge permitted the State to introduce evidence of the transaction involving Henry Lang but denied admission of the transaction involving the Crigleys.

Henry Lang testified that on August 30 Arthur LaGace and another person named Frank came to his home at his request to repair a thermostat. They represented themselves as coming from Central Heating. One man went into Lang's bedroom and upon returning told Land that his toilet was overflowing. Later, Central Heating's "plumber" arrived. He told Lang that there was a cracked tile that would cost $2,400 to repair. He identified the defendant, Norton, as that man. Lang gave Norton a check for $200 and $70 cash as a down payment. The next day Lang removed two handfuls of tissue from the toilet and called Central Heating to cancel the job because he had fixed the toilet himself. LaGace returned to Lang's home and introduced himself as a police officer. He used a blue canister to spray the toilet and basement fixtures. Lang knew Norton by the name of "Stan Lubanski." Norton told LaGace that the job was bigger than originally thought and that it would cost $56,000. When Lang balked, "Stan" reduced the price to $50,000. Lang signed a contract with Central Heating for $50,000 to repair his plumbing system. (A document's examiner for the Chicago police department testified via stipulation that the Lang proposal which bore the name of "Stan Lu-

banski" was, in fact, signed by Norton.) Lang gave Norton a check for $22,600. On September 12, Lang gave Central Heating final payment of $25,000 and stopped payment the next day.

Arthur LaGace was recalled and testified that he and his brother William went to Henry Lang's home on August 30 to repair a thermostat. LaGace told his brother to stuff the toilet with tissue. After attempting and failing to clear the toilet, LaGace called Supreme Heating's office. In response, Norton came and introduced himself as the plumber, "Stan Lubanski." Norton told Lang that he needed a rod-out job and wrote out a service order and collected $270. The next day Arthur LaGace and his brother William returned. Lang had cancelled the job because he cleared the toilet himself. LaGace and his brother told Lang that they had come to make sure that the toilet was clear. LaGace sprayed air-conditioning cleaner into the toilet, and his brother stuffed garbage bags down the basement toilet drain. After the toilet overflowed his brother began stuffing clay into the drain. A day or two earlier, Nearn had told LaGace to stuff garbage bags down the toilet drain after LaGace reported that the Lang roof was too steep to drop boards in the stack pipe.

LaGace also testified that Norton returned to Lang's home the next day and again introduced himself as Stan Lubanski. Norton told Lang that the basement floor needed to be ripped up and the floor tiles replaced. The cost would be $50,000. LaGace admitted receiving a check from Lang in the amount of $25,000 made out to Central Heating. He said the check was deposited into his checking account at the request of Nearn in order to avoid special attention to Central Heating following the arrests at the Rolek job. The judge, out of the presence of the jury, sustained an objection to the testimony concerning what Nearn had said on the ground that the conversation had not been given to the defendant pursuant to a discovery request.

Pauline McCormick was also recalled and testified that she received a telephone call at the end of August from someone at the Lang house about the work being done. She told the person to "get the hell out of there." When she told Nearn about the call, he said everything was alright and "they can work him again."

■ The general rule concerning proof of other crimes has been recited so often that citation is unnecessary: Other crimes may not be proved if their purpose is to show a propensity to commit crime; but they may be shown to prove identity, motive, intent, guilty knowledge, absence of mistake, *modus operandi* or a general scheme or plan. The trial judge allowed the Lang evidence as proof of *modus operandi* and a general scheme or plan.

■■ ■ Before evidence may be admitted under the *modus operandi* exception to the rule, "a strong and persuasive showing of similarity" between the crime charged and the defendant's other crime must be shown. (*People v. Taylor* (1984), 101 Ill. 2d 508, 463 N.E.2d 705.) But as the *Taylor* court pointed out, the crimes need not be identical, and dissimilarity will always exist between independent crimes. We believe that sufficient points of similarity existed between the Rolek and Lang crimes: Both were prior customers of Central Heating; both were elderly; both jobs involved repairs of basement sewer pipes; both involved acts of sabotage; both contracts were written on Central Heating forms; both involved LaGace and Norton, who used the same name, "Stan Lubanski," in both; and both were for $50,000. In addition, both occurred within a short period of time. Therefore, the trial judge did not abuse his discretion by admitting evidence of the Lang crime. For the same reasons, we believe the evidence was admissible to show a general scheme or plan.

■■ Nearn also argues that he was prejudiced by lengthy and extensive testimony concerning the Lang crime. The answer to this argument is Nearn's first argument that sufficient points of similarity must be established. In order to establish those points of similarity the testimony of LaGace, Lang, Pauline McCormick and the handwriting expert was necessary.

Nearn next contends that error was committed by the introduction of the previous dealings between Central Heating and Rolek. He argues that the evidence was irrelevant and that it was introduced to convince the jury that Nearn had previously defrauded Rolek, thus showing a propensity to commit a crime.

During its opening statement, the State told the jury that for at least three years Central Heating, under Nearn, had been doing business with Rolek to the extent that she spent $16,000. That included the installation of two furnaces, one in 1980 and a replacement which was sold to her in 1983. No objection was made to that statement; but Nearn's attorney made a motion *in limine* after the opening statement had been completed, seeking an order barring any reference to other services that Nearn had performed for Rolek. He pointed out that the State had not alleged those jobs were based on fraud or any other criminal element. The judge said that he would permit the State to go into it and that he assumed that the proof would show that "there was a prior relationship." The assistant State's Attorney said, "That is correct." The assistant State's Attorney did not say that he was attempting to show another crime under any of the exceptions to the rule barring such evidence.

Rolek then testified to the previous transactions between her and Central Heating. She identified eight separate contracts covering the work that had been done over a three-year period. No objection was made to that testimony. On redirect she testified that earlier in 1984 she paid Central Heating $9,770 to remove and replace basement wiring. Nearn's attorney objected that the question exceeded the scope of cross-examination. Rolek did not testify as to any complaints about the contracts or that the work was unnecessary, except for some attic work. The following occurred on cross-examination by the *attorney for Norton*:

"Q. Miss Rolek, you testified that you had several home repairs done by Central Heating over the course of the years?

A. Yes.

Q. And you stated that you didn't think your attic work was needed? You said your roof wasn't caving in?

A. Yes.

Q. After that, *if you didn't think these people were honest*, why did you continue to use them?

A. Well, I was scared. I lived all my life by myself, I wouldn't care, but I had tenants. And that is why I was afraid, because I was afraid they might sue me if anything happened to them." (Emphasis added.)

When the Rolek contracts were offered into evidence, Nearn's attorney said that he objected because they had signatures of people who are not involved in this case. The judge overruled the objection, holding that they showed a relationship between Central Heating and Rolek. He held that the exhibits were admissible only as to Nearn.

During the cross-examination of Nearn the assistant State's Attorney established that there is generally a guarantee on a furnace or boiler and that the guarantees run as high as 25 years and as low as 10 or 15 years. Nearn testified he did not know whether Central Heating sold two boilers to Rolek in three years. He said it was possible. An objection was made on the ground of lack of foundation. He was then cross-examined about two contracts which purported to show sales of furnaces to Rolek by Central Heating, one in 1980 for $3,000 and one in 1983. Then he was asked whether it was unusual to sell one person multiple furnaces within a short period of time. At that point, the attorney for Nearn asked for a sidebar and for the first time made an objection that the State was trying to show by innuendo and insinuation that the jobs were either unjustified or the prices were too high, the argument he now raises in this court. The judge said he would let the evidence stand for two reasons, to show

the relationship of the defendant to the particular customer, Rolek, and to show a common scheme and design. The court conceded that there had been no showing, and that there might not be any showing, that the second boiler was not needed. He expressed the thought that certain inferences could be drawn from the fact that one had two furnaces within a three-year period. When they resumed before the jury, the assistant State's Attorney asked whether Rolek was the only person that Central Heating ever sold multiple boilers to within a five-year period or a three-year period, and the defendant stated that she was not.

During closing argument the State made only passing references to the contracts, except that both prosecutors mentioned the two furnaces within a three-year period. No objections were made to the arguments.

In the post-trial motion, Nearn's attorney did not specify that the cross-examination of Nearn was error. Instead, he alleged that error was committed by "allowing the details of several prior contracts" between Nearn's company and Rolek into evidence, "even though there were no allegations of any wrong doing by Nearn" with respect to the contracts. The motion referred to the specific exhibits which were the contracts. In the argument on the motion, the defendant's attorney said this:

> "Now, your Honor, we objected *for the record* to the introduction of any prior contract of Rose Rolek in the State's case-in-chief. That objection was overruled. But perhaps that would not have been so bad. *Perhaps it was okay to refer to the fact that she was a prior customer and in fact, in all fairness, once the State had admitted in their case-in-chief, we then let him say from the stand, 'Yes, Rose Rolek was a prior customer.'* But then they went in to the details of each of these prior contracts and that was impermissible is our contention." (Emphasis added.)

■ We believe that Nearn has failed to preserve this question for review. All of the evidence had been received without an appropriate objection, even the Rolek contracts themselves. It was not until after Nearn had been cross-examined extensively that his attorney made the objection that the State was attempting to insinuate that Nearn had previously cheated Rolek. The jury had already heard Rolek, and, we repeat, the contracts had been received. The first suggestion that anything might be considered inappropriate in the dealings between the parties was made by a volunteered remark by Rolek that she did not believe that the attic work was necessary. No objection was made

to that remark. And it was the attorney for Norton who brought out that Rolek thought Central Heating had been dishonest.

■ Even if we concluded that the assignment of error had been preserved, we do not think that the evidence of prior dealings between the parties was improper. One of the charges was conspiracy to commit theft by deception. Confidence and reliance are the warp and woof of swindles. The evidence of prior dealings, even if honest, would be probative to establish that Rolek had confidence in Nearn's company and relied on its representations. Significantly, Nearn had LaGace use, not Supreme Heating order forms, but Central Heating's.

The evidence was admissible for another reason. A fact finder would wonder why LaGace went to Rolek. Therefore, it was relevant to show that he did not pick her by happenstance but rather that Nearn knew her and, most important, knew that she was an aged and uncomplaining customer.

■ We agree with the court's conclusion that proof of another crime is permissible to establish a general plan or scheme, one of the reasons he ascribed for ruling against the belated objection of Nearn after the cross-examination had been virtually completed. That said, however, there are still questions to be resolved: Did the State show a crime in the two-furnace transaction and, if so, that Nearn committed it? The general rule is that other crimes need not be proved beyond a reasonable doubt. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) But it has also been generally held that it must be shown that the occurrence sought to be introduced was a crime and that the defendant participated in it. (*People v. Gugliotta* (1980), 81 Ill. App. 3d 362, 401 N.E.2d 262; *People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155.) And the proof must be more than such that creates more suspicion. (*People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 469 N.E.2d 305.) The rule has been considered with contrary results. Compare *People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 469 N.E.2d 305, *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334, and *People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155, with *People v. Mitchell* (1984), 129 Ill. App. 3d 189, 472 N.E.2d 114, and *People v. Gugliotta* (1980), 81 Ill. App. 3d 362, 401 N.E.2d 262.

■ We are not convinced that the evidence establishes beyond mere suspicion that the two-furnace transaction meets the requirements that a crime be shown and that Nearn participated in it, and we do not believe the evidence was admissible on the second ground ascribed by the trial judge. But the fact that the evidence might not

meet the required standard of proof does not mean that the State did not have the right to cross-examine Nearn about the transactions which were already in evidence. We hold that it did. A substantial part of Nearn's testimony was designed to show that he was an able and responsible administrator of his heating business. When the State began to cross-examine him about his knowledge of the actions of his employees and agents, his testimony became evasive. In pursuing that line of examination, the State questioned him about his knowledge of the Rolek transactions. No reasonable person would say that sales of two furnaces in three years to an elderly woman would not present a proper subject of inquiry at least, particularly when the first sale in 1980 was of a "new furnace" and the second sale in 1983 was for another "new furnace"; and part of the 1983 order was the direction to "[r]emove *junk* furnace." (Emphasis added.) We conclude, therefore, that no error was committed by the introduction of the previous transactions between Rolek and Central Heating nor in the cross-examination of Nearn. See *People v. Palmer* (1962), 26 Ill. 2d 464, 470-71, 187 N.E.2d 236, 240.

Nearn also contends that the trial judge committed error in allowing him to be impeached with his failure to file Federal tax returns from 1969 to 1979. Before trial Nearn moved *in limine* to preclude his impeachment with a misdemeanor conviction for failure to file income tax returns, and the trial judge granted the motion.

During cross-examination the State sought to question Nearn about his failure to pay income taxes from 1969 to 1979. Over objection, the trial judge permitted evidence that he had not filed income tax returns for those years, but refused to allow evidence that he had been convicted for failure to file returns. The trial judge himself asked the questions to avoid the possibility that the questions would elicit any notion of conviction. Under the judge's questioning, the defendant admitted not filing Federal income tax returns for those years.

■ The prohibition imposed by a motion *in limine* may be lifted if the defendant's evidence "opens the door." (*People v. Rosenberger* (1984), 125 Ill. App. 3d 749, 466 N.E.2d 608.) This is such a case. Any reasonable person reading the direct testimony of Nearn would conclude that he was attempting to convince the jury that he was a highly principled and self-made man who always paid his debts. Part of his testimony established that he had entered into a business partnership around 1969 and lost $85,000. He said that he ignored the advice of his attorney to file for bankruptcy, because he did not believe in bankruptcy. Since the failure of the business caused his partner to

have a heart attack, which he survived, Nearn "assumed the liabilities." When he was asked what he did about the liability for $85,000, he said this:

"I was hounded, pounded, sued, garnished all over. I came to the north side of Chicago, went to work for other heating companies. I went to work five years and paid off the $85,000. Paid off every cent. Every dime."

He then told the jury that during that period he worked for several companies making $30,000 to $35,000 a year, and in 1977 having paid "off all the money" he had "about $30,000, $35,000 he had saved up."

Few people would not be impressed by a person who earned at most $175,000 in a five-year period, who assumed an obligation which was not completely his and was still able to pay off $85,000. Under these circumstances we do not believe that the trial judge abused his discretion in permitting this cross-examination to disabuse the jury of the favorable impression Nearn's testimony may have created. *Cf. People v. Baseer* (1980), 90 Ill. App. 3d 866, 414 N.E.2d 5.

■■■ Nearn next maintains that his conviction should be reversed because the State violated its discovery obligations.

LaGace was cross-examined extensively by Nearn's attorney about checks he deposited or had deposited in an account he had under the name "Home Remedy." He was specifically asked about the $25,000 Lang check being deposited in that account. The check was made out to Central Heating. On redirect examination the assistant State's Attorney asked why he had put the Lang check in his own account. An objection was made on the ground that it called for a conclusion. He answered that when the check was received from Lang they had problems with the Rose Rolek case. A general objection was made and overruled. The witness testified that "they" didn't want special attention brought to the check. An objection was made as to use of the term "they." When he was asked if anything was said by anybody at the time he got possession of the check, an objection was made on the basis of hearsay. He then testified that Nearn was talking to Pete Lewis and they were trying to decide what to do with the check. An objection was made on the grounds that it was "gross hearsay" and that there was no foundation. He then testified without objection that Nearn said he would not put it in the Central Heating account because of the problems they were having with the Rolek case. When the witness testified that Lewis asked him if they could put it in the Home Remedy account for clearing, Nearn's attorney objected again on the ground of hearsay. The judge ruled that the objection

would be sustained as to what Lewis said but not as to what Nearn said.

. Out of the presence of the jury, and after the examination of La-Gace had been completed, Nearn's attorney pointed out that none of the documents they had received in response to discovery requests included the conversation between LaGace, Nearn and Lewis. The assistant State's Attorney explained that he never intended to go into the conversation and did not do so on his direct examination. He argued that the cross-examination had required him to have LaGace explain why he had put the check in his own account. Nearn's attorney moved to strike the testimony and asked the court to instruct the jury disregard it.

The following day the judge ruled that the failure to turn over the contents of the conversation between LaGace, Nearn and Lewis had been inadvertent on the part of the State; but, since the information had become known to the State after the trial began, the State was obliged to inform Nearn's attorney of the contents. The judge also held that the statement of Nearn constituted an admission and said that he would admonish the jury to disregard any statements purportedly attributed to Nearn in that conversation. He said the jury could consider if there was a meeting and whether Nearn, Lewis and La-Gace did discuss the $25,000 blank check, but they could not consider whatever Nearn purportedly said. When the jury returned to the courtroom no one, including the attorneys for Nearn, spoke about the inadmissible testimony. Nearn made no assignment of error on this point in his post-trial motion.

Nearn now argues that the State's failure to comply with the discovery rule constituted reversible error. We disagree. Apart from the question of waiver, which, admittedly, the State has not argued, we hold that this evidence did not prejudice Nearn, considering the entire record.

In *People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970, the supreme court pointed out that the failure to comply with discovery requirements does not always necessitate a new trial and enumerated the factors to be considered in determining whether a new trial is warranted: The closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice could have helped the defense discredit the evidence.

In our judgment, the case against Nearn was extremely strong despite the obvious shortcomings of LaGace. Nearn argues that the evidence was "devastating" because it "constituted direct evidence that Mr. Nearn was involved in what had occurred at the Rolek

house." But, there was an abundance of other direct evidence showing Nearn's involvement in what had occurred at the Rolek house. Don Wennersten, a friend of Nearn's, testified that Nearn told him that he would have work for him on September 10. It was on that date Norton asked him to go to the Rolek home. James Duncan, Nearn's nephew, testified that Nearn told him to go with Nearn, Jr., to the Rolek home. Richard Hering, a plumber, testified that Nearn hired him to do the plumbing work at the Rolek home. And, Glen Kimble testified that he was arrested at the Rolek home and that Nearn told him the arrest occurred because "he (Nearn) charged too much."

Last, we are not convinced that prior notice would have provided the defense with any greater opportunity to discredit the evidence. Nearn's attorney cross-examined LaGace about the conversation, and Nearn, who testified after LaGace, had an opportunity to deny the conversation. It was the position of Nearn's attorneys throughout that everything LaGace said about Nearn's involvement was perjurious. If Nearn's attorneys could convince the jury that LaGace was lying about the early July meeting, testimony which Nearn denied, the jury, it is fair to infer, would believe that he lied about the conversation also. Consequently, weighing all the factors to be considered we hold that the evidence could have been properly received; and no error occurred because the judge failed to admonish the jury.

Nearn was fined $2,575 and Norton was fined $795. Nearn was free on a $3,000 bond and Norton on a $1,000 bond. The defendants contend that their fines should be vacated.

■■ Fines are disfavored for defendants who lack the ability to pay them. (*People v. Echols* (1986), 146 Ill. App. 3d 965, 497 N.E.2d 321; *People v. Oravis* (1980), 81 Ill. App. 3d 717, 402 N.E.2d 297.) Both defendants were indigent; Nearn was represented by the public defender and Norton by court-appointed counsel. The probation report for both showed them to be "financially depleted." The money for Nearn's bond was posted by friends. Norton posted the $1,000 bond several months before the imposition of the fine. At the time of the imposition, however, the evidence clearly shows that he lacked the financial ability to pay.

■■ The reason given by the judge for the imposition of the fine was, not for punishment, but because the trial had cost the county money through the services of the public defender and payment of a fee to private counsel that had been appointed for Norton. This is not an appropriate reason to impose a fine. (*People v. Cook* (1980), 81 Ill. 2d 176, 407 N.E.2d 56; *People v. Gaines* (1982), 104 Ill. App. 3d 974,

433 N.E.2d 970.) For these reasons we vacate the fines imposed against both defendants.

The defendants maintain that their extended terms are excessive and should be reduced from six years to three years for Nearn and from four years to one year for Norton. Norton has never been convicted of a crime, and Nearn's only conviction was for failure to file income tax returns, for which he was apparently placed on probation.

Both defendants concede that the extended terms are authorized by the statute since the victim was older than 60 years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)(ii)). Their argument is that the judge abused his discretion.

Nearn argues in mitigation that the offenses were committed by others. We do not think it mitigating that he masterminded the scheme, used his facilities and advised others how to perform the illegal acts. We cannot ignore the evidence that he threatened to kill Debbie Moorman if she testified before the grand jury, nor the evidence that, even after the Rolek arrest, the illegal enterprise was still being advanced against Lang, nor, more importantly, the testimony of Nearn himself which reveals him to be calculating and unremorseful.

With respect to Norton, the evidence establishes that he was an active participant in both the Lang and Rolek crimes, that he "browbeat" an 82-year-old woman into signing and that he also was an advisor to others as to the appropriate way in which to carry out the scheme to prey on elderly victims.

Considering all of these facts, and the nature of the crimes themselves, we think the observations of the supreme court in *People v. Jersky* (1941), 377 Ill. 261, 269, 36 N.E.2d 347, 350, are particularly fitting:

> "On the record before us, nothing short of a miscarriage of justice could produce any other judgment, or any lighter punishment than [these defendants have] already secured."

For these reasons, the judgments of conviction and terms of imprisonment are affirmed; the judgments imposing fines on each defendant are vacated.

Judgments affirmed in part and vacated in part.

HARTMAN, P.J., and SCARIANO, J., concur.