THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT MOORE, Defendant-Appellant.

First District (6th Division)   No. 1—90—1306

Opinion filed March 19, 1993.

1046

Mark W. Solock and Patrick G. Reardon, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Fabio Valentini, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Robert Moore, was convicted by a jury of the first degree murder of Edward McClain, and he was sentenced to 30 years' imprisonment. He maintains that trial errors occurred which require that he be granted a new trial; he does not dispute the sufficiency of the evidence.

Tyrone McClain (Tyrone) had been living at the apartment located at 1761 East 73rd Street in Chicago for approximately one week before the death of his brother Edward. Tyrone was staying with Edward and Edward's girl friend, Sheila West, to whom the apartment was rented.

The apartment had two entrances. The back door consisted of one rear wooden door, as well as burglar bars and an outer screen door. The burglar bars and the screen door were always kept locked.

Tyrone testified that he met the defendant three times, the last time the day Edward was shot, March 23, 1989. Edward introduced the defendant to Tyrone as "Rob." Tyrone knew the defendant only as "Rob" and did not learn his last name. On the morning of March 23, 1989, Sheila West left the apartment along with her sister, Angel West, at approximately 11 a.m.

Around 1 p.m., Tyrone was looking out the living room window and saw the defendant pull up in his Blazer vehicle. The defendant parked the car on the street and later knocked on the front door; Edward let him in. Edward accused the defendant of not returning a pistol that belonged to Edward. The defendant said that he had given the pistol to Sheila West. When Edward questioned him further, the defendant repeated that he had given the pistol to Sheila.

Edward was sitting on the couch and again asked the defendant for his pistol. An exchange then took place between the defendant

and Edward which we will discuss later when addressing the defendant's claims of trial error. After that exchange the defendant left.

At approximately 2:20 p.m., while Edward and Tyrone were eating and watching television, a knock came at the back door. Edward went to the door and said, "Who is it?" A man, whose voice Tyrone identified as that of the defendant, said, "Rob." Edward asked him what he wanted because, Edward said, the defendant had just left out the front door. After Edward opened the door, Tyrone heard three loud shots one after another. After Tyrone heard the shots, he remained sitting in the living room and then walked toward the kitchen, where he saw his brother lying on the floor. The rear wooden door was wide open, but the burglar bar and screen door were still closed.

When Tyrone asked Edward who had shot him, Edward replied, "Rob." Since there was no phone in the apartment, Tyrone ran outside to get help and found a police car down the block. When the police officer arrived, Tyrone told her that "Rob" had shot Edward.

At the time of trial Tyrone was serving a prison sentence for armed robbery; he had been convicted in December 1989. In October 1984 he had been sentenced to four years' imprisonment for burglary. In January 1983 he had been sentenced to 18 months' imprisonment for possession of a stolen motor vehicle. In 1980 he had been sentenced to two years' imprisonment for theft.

Police officer Inovskis testified that at approximately 2:20 p.m. she arrived at the scene of the shooting. She asked Tyrone if Tyrone knew who the offender was, and Tyrone said it was "Rob."

Dr. Nancy Jones, an assistant medical examiner, testified that the victim had four shotgun wounds: a grazed wound on the anterior of the left thigh; a close-range wound on the back of the right upper arm from which wadding was recovered; a wound on the side of the right buttock; and multiple individual pellet wounds covering an area on the left back and buttock that extended for about 22 inches from the shoulder to the buttock. All the wounds were on the back side of the deceased. In Jones' opinion the gun was fired from a distance of less than a foot to two feet. Her toxicological analysis of the victim's blood revealed .29 micrograms of benzylecaline, the first breakdown product of cocaine. Benzylecaline can be recovered up to four hours or longer after the cocaine has been ingested.

Sheila West testified that she had lived at the apartment at 1761 East 63rd Place for approximately five years. In January 1989 the defendant sold Edward an ounce of cocaine for $40. Because Edward did not have the money, he gave the defendant a pistol for security.

Later in the month, Edward paid the defendant, but the defendant never returned the pistol.

On the morning of March 23, Sheila and her sister Angel left the apartment. Between 2 p.m. and 2:30 p.m. Sheila returned home and found that Edward had been shot. She had a conversation with Angel during the following evening; Angel told her that she had seen the defendant get into the Blazer. Sheila knew the defendant only as "Rob." She did not tell the police what Angel had told her because she did not know it was important.

Laranda "Angel" West was a sophomore in high school at the time of trial. She testified that she met the defendant through her friend named Annette, the defendant's former girl friend. Angel had seen the defendant 50 or 60 times in the previous year. On the morning of March 23 Angel had been living with her sister at the apartment for a week.

At approximately 11 a.m., Angel and Sheila left the apartment to visit a friend and to make a telephone call. After two hours at the friend's house, Angel left to visit her friend Annette, who lived in the same courtyard building that Sheila lived in. When there was no response at Annette's apartment, Angel went down the walkway to visit Gwen's apartment, another friend in the building.

As she approached Gwen's apartment, Angel heard four shots. After hearing the shots, Angel "ran to the alley and looked down." She saw the defendant getting into a Blazer; he was carrying a shotgun. On the following day she told her sister that she had seen Rob getting into the Blazer carrying a shotgun.

On cross-examination, Angel recalled an interview at the State's Attorney's office on February 26, 1990; the defendant's attorney, two prosecutors and Detective Kelly were present. Angel denied telling the defendant's attorney that she did not hear gunshots on the day of the killing. She first said that she did not report that she had seen the defendant carrying a shotgun until February 26, 1990. She did not tell Gwen anything about her observations even though Gwen asked her if she had heard the shots.

The defense was an alibi. Willie Jones, who lived next door to the defendant, testified that he saw the defendant in the backyard of 5409 Shields from approximately 1 p.m. until 4:30 p.m. Carmen Statum testified that she had been checking on the defendant "every ten minutes or every hour" before 4 p.m. Mary Moore, the defendant's sister, testified that the defendant spent the afternoon washing cars in the backyard and that at approximately 4 p.m. she went for a drive in the defendant's Blazer.

The defendant testified that he had worked for Watkins Motor Line for approximately three weeks before he was arrested. He was a high school graduate and had also graduated from the Washburn Trade School as an auto mechanic. He first met Edward in January 1989. He sold Edward cocaine and was holding Edward's gun as collateral.

The defendant was living at 77th and Stewart between January and March 1989, although he frequently visited his parents' home at 5409 Shields. The only time he ever saw Tyrone was on the day of the shooting. The defendant went to the apartment in order to help Edward move. He went to the apartment in his black Bronco; he did not own a Blazer.

When he arrived at the apartment on March 23, he entered through the front door. He knocked on the door and was asked who was there. He replied, "Robert." Edward also knew him by the name "Guy." Edward asked him about the gun. He did not yell at Edward; he was not angry at Edward. He did not help Edward move that day because Edward was unhappy with him about the gun. He told Edward that he had given the gun to Sheila. He left the apartment through the front door and went to his mother's house. He never returned to Edward's apartment that day. He did not shoot Edward. He got to his mother's house at approximately 1:15 p.m. or 1:30 p.m. and proceeded to wash two cars for the rest of the afternoon.

On cross-examination he testified that Edward paid him back the $40 for the cocaine. The gun had been stolen from the defendant's car. He felt bad about the fact that the gun had been stolen. He lied to Edward when he told him that he had given the gun to Sheila.

The defendant's attorney, Barry Sheppard, was permitted to testify on behalf of the defendant. He testified that on February 26, 1990, he questioned Angel West in the presence of two assistant State's Attorneys. He "asked [Angel West] if on March 23, 1989, before she saw Robert Moore get into a car, she heard gunshot noises." He testified that Angel told him that she did not hear gunshot noises.

On cross-examination he testified that he did not bring a court reporter despite the trial judge's suggestion that he do so. He looked for a court reporter but could not find one available. He wrote out what Angel West told him. He did not show what he had written to Angel. He did not ask Angel to sign any statement that he had written down.

In rebuttal the State established that the defendant had been terminated from Watkins Motor Line after three days because he did not show up for work.

Assistant State's Attorney Julie Rosner, who was present at the interview of Angel West by Barry Sheppard, testified that when Sheppard asked Angel if she had heard gunshots, Angel replied that she had heard gunshots. Rosner did not take notes of the conversation between Sheppard and Angel.

Detective John Segers testified that he had a conversation with the defendant on the day after the shooting. The defendant told him that he and Edward had had an argument. He also told Segers that he had left Edward's apartment between 2 and 3 p.m.

By stipulation it was established that on September 26, 1988, the defendant had been convicted of misdemeanor theft and sentenced to one year's probation.

The defendant's principal claims of error center on testimony of Tyrone that, in the dispute over Edward's gun, Edward told the defendant that he could receive the death penalty for the killing of a man on Jeffrey Avenue. The defendant maintains that prejudice occurred during the State's opening statement in which the prosecutor referred to the evidence, during the testimony of Tyrone, during the cross-examination of the defendant and during the State's closing argument in which the prosecutor again referred to the evidence. The State contends that the defendant waived argument on this point by failing to object to the opening statement or the examination of Tyrone.

The problem with the State's contention that the defendant waived any right to claim error in the introduction of evidence of the deceased's statement about another killing lies in the defendant's alternative claim that his attorney rendered ineffective assistance by failing to make appropriate objections. We agree with the State that the defendant waived the claim of error, but we deem it appropriate to address the issue.

During the opening statement the prosecutor told the jury that the evidence would show that Edward told the defendant that he could get the death penalty for killing a person on Jeffrey Avenue. No objection was made to that statement.

During the direct examination of Tyrone the following occurred:

"Q. Okay. And what did he say after he wanted his pistol back then?

A. Robert Moore said, 'I ain't got it. Sheila came and got the pistol.' Then my brother said, 'Yeah. Well, I'll fix you dirty mother fuckers fucking with me.'

* * *

A. And then Rob said, 'I told you, man, I gave the pistol to

her.' My brother said, 'That's all right. You know you can get the death penalty for killing that mother fucker on Jeffrey.' "

Although the defendant's attorney did not object to that statement, the trial judge immediately issued his first limiting instruction to the jury:

"The jury may consider this alleged statement by Edward McClain only as it may affect Robert Moore's state of mind and not for the truth of the matter asserted in the statement. That is, whether there was a shooting on Jeffrey and who may have done it is not a matter of proof and is not at issue. The defendant has never been arrested or charged with any shooting on Jeffrey."

After the judge's statement, Tyrone continued:

"So then my brother started talking to him [the defendant] again. Then he mentioned about the same thing again. And Rob started looking the other way, like, you know, he didn't even hear the statement. And then he [the defendant] got up and left."

On cross-examination the defendant's attorney asked Tyrone if the defendant acted as though he had not heard Edward's threat. Tyrone responded that the defendant acted as though he did not hear when Edward told him that he "could get the death penalty for killing the lady['s] husband on Jeffrey."

On redirect examination, Tyrone said that the defendant and Edward were arguing about the pistol. Tyrone also said that the defendant and Edward were not friendly when discussing the other shooting on Jeffrey. At this time, the judge issued his second limiting instruction:

"Again, jurors, with the caution that this remark, or this statement about some shooting on Jeffrey is not meant to prove anything as to whether there was a shooting; who did the shooting. The defendant, again I remind you, has never been arrested or charged for any such shooting on Jeffrey, if a shooting existed. And that testimony regarding a shooting on Jeffrey is just to be considered by you, if you choose, as it might reflect the defendant, Mr. Moore's[,] state of mind and for no other reason."

The defendant testified that he and Edward discussed the gun, but the defendant did not yell at Edward; he was not angry with him. During cross-examination, the following occurred:

"Q. Did Edward—are you saying Edward never said to you that you could get the death penalty for killing that mother fucker on Jeffrey Street?

A. No.

Q. Never said anything about that. He never mentioned Jeffrey Street?

A. No.

Q. Or the death penalty?

A. No.

Q. Or killing anybody else?

[DEFENSE ATTORNEY]: Objection."

The judge ruled that "anybody else" would be stricken. The judge then gave his third limiting instruction:

"Some admonitions and qualifications as I gave the jurors earlier will stand. Any reference to some killing on Jeffrey Street can only be considered by the jury as they may choose in terms of the defendant Moore's state of mind.

They cannot consider any statement with respect to some killing on Jeffrey for the truth of the matter asserted in the statement. And, once again the defendant, Mr. Moore, has never been arrested or charged for any possible killing on Jeffrey."

■ Both the defendant and the State now argue over the applicability of the exception to the general rule barring evidence of other crimes, which provides that other crimes are admissible to establish motive. We do not believe that the rule governing admission of other crimes is precisely applicable, because the evidence does not establish that the defendant did, in fact, commit another crime. Indeed, the rule governing admission of other crimes requires that it must be established that a crime actually took place and that the defendant committed the crime or participated in its commission. (*People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155.) While proof beyond a reasonable doubt of the defendant's participation is not required (*People v. Scott* (1973), 13 Ill. App. 3d 620, 301 N.E.2d 118), the proof must be more than such that creates mere suspicion. See *People v. Nearn* (1988), 178 Ill. App. 3d 480, 533 N.E.2d 509.

There is no evidence that another killing took place, let alone any evidence that the defendant participated in it. Nonetheless, we have determined that the evidence was admissible. Proof of motive is always admissible even though not required. (*People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900.) And proof of motive may take many

1054

forms—for example, evidence showing hate, revenge, greed, fear, even love—and is not restricted to proof of other crimes.

In this case the evidence was admitted to create the inference that Edward was claiming knowledge of facts which might incriminate the defendant; that Edward was threatening to disclose those facts unless his gun was returned to him; and that the defendant killed Edward to silence him. That the State did not show the defendant actually killed someone else may control the weight of the evidence, but not its admissibility. The trial judge correctly noted that the evidence was not admitted to show the truth of Edward's accusation but rather to show that the accusation might have affected the defendant's state of mind. (*Cf. People v. Albanese* (1984), 102 Ill. 2d 54, 464 N.E.2d 206.) As the judge cautioned, the fact finders were free to decide, first of all, whether Edward actually made such an accusation and, second, what weight was to be given to it.

We conclude, therefore, that no error occurred during the State's opening statement, when Tyrone testified to the threat by the defendant, when the defendant was cross-examined about the threat and when the State argued that the threat was the motive for the killing. Since the evidence was properly admitted, the defendant's attorney was not ineffective for failing to object to it. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) Before we leave this point we express strong approval of the course of action taken by the trial judge in giving cautionary instructions in the absence of any objection by the defendant's attorney. As the supreme court has noted, a judge is more than a presiding officer or an umpire. He is responsible for the justice of the judgment he enters. (*Wozniak v. Segal* (1974), 56 Ill. 2d 457, 308 N.E.2d 611.) A trial judge should interject himself into proceedings with caution, but there are instances where justice requires that the judge do so. This case presented such an instance.

During the cross-examination of Angel West, the defendant's attorney brought out that the defendant had attempted to have sex with her but that she had rebuffed him. The defendant now maintains that that cross-examination by his attorney represented reversible ineffective assistance of counsel.

■ The bench mark for judging a claim of ineffective assistance of counsel is whether defense counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984), 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.) To succeed on such a claim, moreover, a defendant must overcome the strong presumption that the challenged actions might be

considered sound trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) We judge that the defendant has not overcome the strong presumption that the defendant's cross-examination of Angel West was trial strategy.

Angel West was an important witness against the defendant. If the defendant's attorney could show that she was motivated to testify against him because he had been unduly aggressive in an attempt to have sexual relations with her, the strain on her credibility in the eyes of the jury would be more than a fair exchange for any unfavorable impression the jury might have of the defendant that the evidence might have created. It should be emphasized that the evidence did not establish an attempt to rape Angel. In the defendant's attorney's closing argument he emphasized that Angel West might have been motivated to testify against the defendant because of the incident in which he attempted to have sexual relations with her. Apparently he did not so convince the jury, but the mere fact that a tactic was unsuccessful does not establish incompetence. (*People v. Potthast* (1991), 219 Ill. App. 3d 714, 579 N.E.2d 1027.) The cross-examination of Angel West did not constitute ineffective assistance of counsel.

Before the trial began, the defendant's attorney spoke to the judge about interviewing Angel West. The judge suggested that the defendant's attorney bring a court reporter in the event there would be a dispute about what she told the defendant's attorney and someone would have to testify for the defense. The defendant's attorney interviewed Angel without a court reporter. He later told the judge that there was no court reporter available at that time. He interviewed her in the presence of two assistant State's Attorneys and a detective. After Angel testified, the defendant's attorney told the judge that he was prepared to testify that he had asked Angel at the interview whether she had heard gunshots and that she had said, "No, I did not." The judge permitted the defendant's attorney to testify. The attorney then testified and impeached Angel.

While an attorney is not incompetent to be a witness, the right of an attorney to be a witness in a case in which he is representing a party is allowed only when the court, in its discretion, deems it necessary. *Andrea Dumon, Inc. v. Pittway Corp.* (1982), 110 Ill. App. 3d 481, 442 N.E.2d 574.

■ The defendant's claim of error is not that the attorney did testify, but rather that the defendant's attorney did not withdraw before giving testimony. Rule 5—102(a) of the Illinois Code of Professional Responsibility (107 Ill. 2d R. 5—102(a)) provides that an attorney may testify without withdrawing from the case when withdrawal

would "work a substantial hardship on the client." Implicit in the defendant's argument is the assumption that the judge would have granted the defendant's attorney's motion to withdraw. This is an assumption of very doubtful validity. As a practical matter, withdrawal by the defendant's attorney in the midst of trial and substitution by another attorney fully prepared to represent the defendant would be most improbable. We have serious doubts that the trial judge would have permitted the defendant's attorney to withdraw; and a denial of a motion to withdraw would have been justified. For these reasons, we conclude that the defendant's attorney's failure to withdraw, or to seek leave to withdraw, did not constitute ineffective assistance of counsel.

The defendant's last assignment of error concerns the State's closing argument. In addition to the State's reference to Edward's statement concerning the killing on Jeffrey Avenue, which we have already discussed, the defendant maintains that the prosecutor attempted to define the term "reasonable doubt"; the prosecutor commented on Angel West's life experience which, the defendant maintains, was not based on the evidence; and the prosecutor made a passing reference to Ted Bundy. (We take judicial notice that Ted Bundy was accused of the murders of several young women. He was convicted of killing some of them and was executed.)

█ We do not agree that the prosecutor's remarks amounted to an attempt to define "reasonable doubt," and we do not agree that the prosecutor's reference to Angel West's life experience was not based on reasonable inferences from the evidence. We judge that the prosecutor's reference to Ted Bundy was, in part at least, made in response to an argument by the defendant's attorney. In the defendant's attorney's closing argument he said this:

> "And you look [the defendant] in the eyes. He is a nice looking, young man. And he is honest, and he has got a sweet smile. And he has got a nice mother and a good family. And that is the type of people who are worthy of reasonable doubt."

The prosecutor answered that argument thus:

> "He is sitting there and he says smile and he smiles. A lot of murderers are very charming people. So is Ted Bundy. That's how he got all those girls to come to him and kill them.
> * * *
> A lot of killing, nice faces and pleasing personalities. What a person looks like has nothing to do with it. Don't think about that. Think about the evidence."

In our judgment the prosecutor's response was a proper response to the defendant's argument. At least we cannot say that it is clear that the reference to Ted Bundy was improper. The prosecutor made no attempt to compare the multiple killings Bundy had committed with the assassination of Edward; and no one can dispute the truth of what the prosecutor said. The reference to Bundy was, of course, a hard blow, but we cannot say that it was an unfair one.

In addition, we do not believe that the jury's verdict would have been any different if the remark about Ted Bundy had not been made. No possible reason why Tyrone and Angel West would falsely implicate the defendant has been suggested. Tyrone's testimony was corroborated to a significant degree by the defendant himself. He admitted to a disagreement with Edward about the gun; and he admitted to lying to Edward about what had happened to the gun.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.