THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER HAYWOOD, Defendant-Appellant.

First District (6th Division)   No. 1—91—1642

Opinion filed July 9, 1993.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Jane Liechty Loeb, and Daniel M. Rabinovitz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Christopher Haywood, of the first degree murder of Dion Johnson; he was sentenced to 22 years' imprisonment. He contends that he was denied a fair trial because of introduction of improper evidence, improper argument by the State and an improper instruction. He does not contend that the evidence failed to establish his guilt beyond a reasonable doubt.

On March 9, 1990, at 7 a.m. Guido Collona, a Chicago police officer, went to 610 North Ridgeway in Chicago in response to a call. He discovered the body of Dion Johnson lying face down in the rear of a gangway near the backyard of the building. He observed blood spots on the ground leading from the body into the backyard and a great amount of blood in the backyard. Near the high concentration of blood in the backyard, Collona observed a wooden stick, approximately two feet by four feet with blood on it and a plastic bag with several bags inside. The smaller bags contained a white powder which tests later proved to be .6 gram of cocaine. The large plastic bag had blood spots on it. The blood on the bag was never tested for comparison purposes. None of the bags was tested for fingerprints.

It appeared to Collona that Johnson had been shot in the backyard, lost a great amount of blood, and moved to the gangway, where he died. An autopsy revealed that death was caused by a gun shot; the bullet travelled through the right front of Johnson's neck and was recovered from the back of Johnson's spine. A blood analysis revealed the presence of cocaine in the amount of .36 microgram per milliliter of blood.

The police investigation initially focused on Cornelius Sturkey and Kevin Marshall, who led the police to the defendant.

Kevin Marshall, who was 23 years old at the time of trial, had been a friend of the defendant for eight years. On the night of March 8, 1990, he was at the Raddison playlot at Lawndale and Ohio Streets. Marshall had a conversation with someone, and then walked down Ohio Street. He saw Cornelius Sturkey, whom he had known for 15 years. Marshall also saw the defendant, a man named "Calvin," "a dude named Pete," and "Peanut" looking through gangways. When Marshall joined them in searching through the gangways, they all went around to an alley behind a building on North Ridgeway Street. At that time, "Randy" joined the group. After looking through about four gangways for about 5 to 10 minutes, they saw a man charging out of the gangway. Someone exclaimed, "I see him, his jacket or something." The group was at the dead end gangway located at 610 North Ridgeway. Marshall was standing approximately 10 to 15 feet from the defendant and Cornelius Sturkey was about 10 feet from Marshall. Marshall testified that the defendant had pulled a gun from his pants and was waving it. He saw the man, later identified as Dion Johnson, whom Marshall knew, run from the gangway; he then heard two rapid shots from the defendant's gun, which was pointed at Johnson. The defendant was about 8 to 10 feet from Johnson when he fired the shots. Before Johnson was shot, Marshall saw nothing in his hands.

After the defendant shot twice, everyone ran except "Peanut," who was later identified as the defendant's uncle. Peanut hit Johnson twice with a stick around the shoulder and neck area and head. Marshall did not see Johnson with any weapon. Marshall also testified that he saw the defendant one or two days after the shooting and told him, "I said I wasn't going to take the heat. If the heat come down on me, I have to tell the truth about it." The defendant responded, "Just don't talk about it."

Marshall did not speak to the police until one month after the shooting, when the police came to see him. He testified that he did not tell the police that the defendant exclaimed, "Give it up" before Johnson was shot. A police officer later testified that Marshall did make that statement.

Cornelius Sturkey, 28 years old at the time of trial, had known the defendant since he was a "young guy." He also knew Peanut, the defendant's uncle, and "Randy," who he thought was the defendant's brother or nephew. On March 8, Sturkey was walking north on Lawndale from his mother's house when he met the defendant, Pete, and Calvin. (Calvin and Pete were not further identified.) The defendant told Sturkey that someone had "just stuck him up." The group

walked down Ohio Street toward Ridgeway when Sturkey saw Marshall. The entire group then began to look for the man who had robbed the defendant and began to search the alley between Ridgeway and Hamlin. While they were looking in the alley between 610 and 612 Ridgeway, someone said, "There he is. There he is." Johnson came running out of the gangway. At this time the group was composed of the defendant, "Pete, Little Pete, Randy, Calvin, Sturkey and Marshall." When Johnson was sighted, the defendant was in the yard of 612 North Ridgeway. Sturkey was about 10 feet from the defendant. After Sturkey heard someone say, "There he is," Sturkey saw the defendant with a gun. He testified that the defendant shot at Johnson maybe once or twice.

On cross-examination, Sturkey testified that Johnson did not have anything in his hands and did not shoot at the defendant. He did not hear anything before the shot and was not sure whether the defendant said, "Give it up," before he fired the shots.

The defendant testified that he was playing basketball at the Ryerson playground on March 8, 1990, at approximately 11:45 p.m. On the way to his grandmother's house, he was approached by Johnson, who had a gun. Johnson told him to "stick it up" and demanded all of the defendant's money. Johnson patted down the defendant and told him to pull out all his pockets. When the defendant said that he had no money, Johnson said that the defendant was lying and hit him in the head with the gun. He instructed the defendant to turn around; 10 seconds later the defendant looked over his shoulder and saw that Johnson had gone. He then ran to his grandmother's house and retrieved a basketball and a gun from the back shed. He returned to the playground to warn his friends.

On the way to the playground, the defendant saw his brother Brandon, Willie Joiner, Sturkey, Marshall, and Kevin Grenshaw. They were searching for the "guy who had just stuck up Willie Joiner." When the group reached 610 N. Ridgeway, the defendant saw Johnson. The defendant removed the gun from his pocket and held it as the group approached the gangway. The defendant yelled, "Give up." Johnson came running out of the gangway. The defendant saw Johnson's hands "coming out of his pocket," and the defendant thought Johnson had the same gun in his hand that he used to strike the defendant earlier. The defendant testified that he fired his gun once and ran.

On cross-examination, the defendant admitted that he told an assistant State's Attorney that he was not present when the shooting took place and learned of the shooting through the news media. He

never told the police or the State's Attorney of the version of events that he testified to at trial, nor did he ever report the earlier incident with Johnson. He disposed of the gun in a garbage can on the street and never notified the police. He did not remember whether his uncle, Peanut, was there, and he did not remember whether Peanut hit the deceased.

By stipulation it was established that Johnson was convicted in 1977 for aggravated battery and received five years' probation and six months' imprisonment. In 1977, he was convicted of attempted murder and received a sentence of four to eight years' imprisonment. In 1987 he was convicted of robbery and received a sentence of three years' imprisonment.

The defendant first contends that he was denied a fair trial by the introduction of a package of cocaine found near Johnson's body and the prosecutor's argument that the defendant killed Johnson because Johnson had stolen the defendant's cocaine.

Before trial, the defendant filed a motion *in limine* to prevent Kevin Marshall from testifying about his statement to the police that Johnson purchased cocaine from the defendant about 45 minutes before the shooting. The prosecutor agreed that Marshall would not testify about the alleged sale. The judge made remarks which we construe to mean that she would allow evidence of narcotics if the State could show that the motive for the killing involved narcotics.

During opening statement the State told the jury that Johnson robbed the defendant of his "coke," and that the defendant "flagged down his buddies" and told them that Johnson had robbed him. He repeated that the defendant killed "that person who took his dope."

After the State rested, the prosecutor asked that the bag of cocaine be admitted into evidence. The defendant's attorney objected and argued that the drugs were irrelevant because the State had not made any connection between the bag of cocaine and the defendant. The defendant's attorney also requested a mistrial because, he alleged, the State had injected evidence of other crimes into the case without any connection between the other crime and the defendant. The prosecutor argued that the drugs were proper circumstantial evidence tending to prove a motive. The defendant's attorney reminded the judge that the only reason she denied the motion *in limine* was because the prosecutors promised that they would make a showing that the drugs were linked to the shooting. The judge admitted the cocaine into evidence but reserved her ruling as to whether the drugs would go back to the jury room. (The record does not disclose any ruling later on whether the drugs went to the jury.)

During closing argument the prosecutor repeatedly referred to the defendant's motive for killing Johnson:

> "His life was snuffed out because he snatched a bag of coke. He was traced down and cornered into a dead end alley and shot by the defendant for six-tenths of a gram of cocaine."

The judge sustained the defense attorney's objection. The prosecutor continued:

> "The victim was a bad person. He was convicted of numerous crimes. He had been to the penitentiary and he was stealing the dope which got him into this in the first place."

Again the judge sustained a defense objection.

In spite of those rulings, the prosecutor continued:

> "We know that his motive has been established, and his motive was explained by circumstantial evidence. *** What is the circumstantial evidence in this case? Well, the victim died clutching a bag of cocaine, and the blood was on the bag. And when the defendant then said, 'Give it up,' what do think the defendant was referring to? Surrender. Here we are the police force. 'Give it up. Come out with your hands up. Give it up.' Refers to the cocaine that the victim died for. That is what the circumstantial evidence is in this case, and that is why the defendant chased the victim into the gangway.
>
>     * * *
>
> What did he die with? The cocaine in his hands. That is why the victim was killed."

In rebuttal the prosecutor again explained the cocaine's significance to the jury:

> "[U]se your common sense. *** How often do you think people flag down a police officer and tell him the proceeds of an armed robbery or they were robbed of cocaine? [Objection overruled.]
>
>     * * *
>
> You think that packet of cocaine would still be sitting there if somebody rifled the gun? Of course not. That cocaine is left there, ladies and gentlemen, to tell you what happened. ***
>
> We know the kind proceeds that were supposedly taken in this supposed robbery. But he didn't take something like cash, like a watch."

We note first that there was no evidence to support the prosecutor's argument that Johnson was "clutching" a bag of cocaine or that the "cocaine was in [Johnson's] hands." But we need not make an issue of those misstatements, because whether the circumstantial evi-

dence is sufficient to connect Johnson and the cocaine, which the State argues at considerable length, is not the issue. The issue is whether the evidence establishes a connection between the cocaine and the defendant. The issue refined, therefore, is whether the evidence establishes that the defendant at one time possessed the cocaine and that Johnson robbed him of it. Proof that the defendant possessed cocaine, of course, is proof of another crime, and proof that a defendant committed another crime is always admissible if it establishes a motive for the crime for which the defendant is being tried. Proof of another crime need not be beyond a reasonable doubt, but it must be more than such that creates mere suspicion. *People v. Nearn* (1988), 178 Ill. App. 3d 480, 533 N.E.2d 509.

The State maintains that it has established that the defendant possessed the cocaine and that Johnson robbed him of it by circumstantial evidence. That circumstantial evidence is (1) the defendant told Sturkey that someone had robbed him; (2) Johnson was seen and identified as the robber; (3) cocaine was found near Johnson's body; and (4) the defendant told Johnson, "Give it up." The State stresses this last circumstance and maintains that when the defendant yelled, "Give it up," the "it" was the "cocaine."

At this point it is necessary to clarify the record. In its brief the State makes the following statement:

> "On cross-examination, Detective Keane testified that after defendant was given his Miranda rights, defendant admitted that he shot the victim twice with a handgun, and that immediately prior to the shooting defendant yelled, 'Give it up.' "

That statement is incorrect; the defendant made no such statement to Keane. The part of the record to which the State refers reflects the following in the cross-examination of Officer Keane:

> "Q. And isn't it a fact *Kevin Marshall told you* that immediately prior to the shooting Christopher Haywood yelled, 'Give it up' and then, Chris fired at the victim twice with a handgun just as the victim reached the northwest corner of the building?
>
> A. If I recall correctly, yeah, that's what he said." (Emphasis added.)

Marshall denied ever making that statement to the police. Sturkey testified that he did not hear anything before the shot and was not sure whether the defendant said, "Give it up," before he fired the shots.

But even if we accept the State's contention that the defendant had said, "Give it up," before he fired the shots, we judge that the State's circumstantial evidence falls far short of that required to es-

tablish that the defendant possessed the cocaine and that Johnson stole cocaine from the defendant. We further judge, therefore, that it was error to introduce the cocaine found near Johnson's body, but it was a more serious error for the State to argue that Johnson had robbed the defendant of the cocaine and that the robbery by Johnson was the motive for the killing. The State's evidence was "simply too slim a thread upon which to tie the State's theory of motive." *People v. Smith* (1990), 141 Ill. 2d 40, 59, 565 N.E.2d 900.

We agree with the defendant that the judge's rulings were inconsistent. We see nothing wrong with the judge's pronouncement before she heard the evidence that she would permit a reference to narcotics, if the State could prove that narcotics formed part of the motive. After she made that ruling, we can understand why the defendant's attorneys did not object to the prosecutor's remarks in opening statement. They properly assumed that the State would connect the defendant to the narcotics. But we do not understand why the judge permitted the cocaine to be introduced into evidence after the State rested and failed to establish a motive. However, if she felt that the State had properly proved motive, we do not understand why she twice sustained defense objections to the prosecutor's arguments that the defendant killed Johnson because Johnson had robbed him of cocaine. Those rulings were correct. The prosecutor, nothing daunted, ignored those rulings and persisted in what we now know to be an improper argument.

We further judge, contrary to the State's argument, that the error was not harmless beyond a reasonable doubt. One part of the State's closing argument could be construed to be a suggestion that the defendant was a drug trafficker. We believe that the evidence of narcotics and the State's erroneous theory based on that improper evidence was so inflammatory that it deprived the defendant of a fair trial. Consequently, we must reverse this conviction and remand the case for a new trial. It is unfortunate that we must do so, because the evidence, although not overwhelming on the issue of self-defense, concededly was sufficient to convict and it was unnecessary for the State to introduce the evidence and argue the theory that it did. The State could justifiably have argued that the motive for the killing, based on what the defendant told Sturkey, was the fact that Johnson had simply robbed him. There was no necessity to bring in narcotics.

We need not address other allegedly improper arguments by the prosecution in determining whether the defendant is entitled to a new trial. Suffice it to say that we expect that when this case is retried the prosecutor will not misstate the evidence as to the extent of John-

son's injuries. He told the jury that Johnson's brains were "crushed." The evidence was that there were two abrasions on Johnson's forehead. We also expect that the prosecutor will refrain from statements like the ones in which he told the jury that after hearing the defense attorney's argument he "could puke" and that the jury must tell the defendant, "[Y]ou can't pull that kind of crap in this city." Such remarks have no place in any trial.

The defendant also contends that the judge improperly instructed the jury on an aggressor's limited right of self-defense. We have considered the authorities cited by both sides and have determined that no error occurred in the court's instructions.

For these reasons, the judgment of the circuit court is reversed and the case remanded for a new trial.

Reversed and remanded.

McNAMARA, P.J., and GIANNIS, J., concur.