THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARL ECHOLS, Defendant-Appellant.

First District (5th Division)   No. 85—140

Opinion filed July 25, 1986.—Modified on denial of rehearing September 12, 1986.

966

Steven Clark and Thomas Long, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Mary T. Nicolau, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant, Earl Echols, was found guilty of the crime of indecent liberties with a child (Ill. Rev. Stat. 1983, ch. 38,

par. 11—4(a)(3)), sentenced to five years' imprisonment in the Department of Corrections and fined $2,000 plus court costs. On appeal, defendant contends that: (1) he was denied a fair trial when the trial court, as a sanction for what it deemed to be a discovery violation, refused to allow his wife, the mother of the victim, to testify on his behalf; (2) he was denied a fair trial when the court precluded him from introducing evidence concerning the victim's reputation for truth and veracity; (3) improper comments by the State in closing argument resulted in a denial of his right to a fair trial; (4) the court abused its discretion in sentencing him to a term of imprisonment rather than probation; and (5) the court abused its discretion in ordering him to pay a fine.

The record discloses that on August 26, 1983, 15-year-old Tracy A., the victim, was alone in her family's apartment with defendant, her stepfather; her mother and brother had left the apartment to take a family friend home. Tracy testified at trial that while she was ironing clothes in her bedroom, defendant kept walking in and out of the room. On the last occasion, he came toward her, she became frightened and she crawled under a bed. Defendant then pulled her out from under the bed and he proceeded to take both of their clothes off. While Tracy struggled with him, he placed "his finger and penis in her vagina" and kissed her "all over her body." Although the window in the room was open and Tracy "screamed" throughout the struggle, no one came to the apartment during this time. Thereafter, defendant told Tracy to take a bath. While proceeding to do so, Tracy looked out the window, saw a neighbor's daughter, Danielle Armstead, and called out to her for help. Danielle ran to get her mother, Linda Armstead.

Ms. Armstead testified that she had heard a "fight" going on in the Echols' apartment earlier that day and thought it was between defendant and his wife, Gladys Echols. She heard screaming, cursing and crying. After Danielle summoned her, she went to the Echols' apartment. Tracy was trying to get out of the apartment door and defendant kept closing it before she could get out. Finally, Ms. Armstead told defendant to let Tracy out. She then took Tracy to her own apartment. Once there, Tracy asked her to send Danielle to get a family friend, Louise Taylor.

Ms. Taylor testified that upon her arrival at the Armstead apartment she found Tracy dressed only in a housecoat. Tracy had a swollen eye, was crying and looked hysterical. After a conversation in which Tracy told Ms. Taylor defendant had raped her, defendant came to the Armstead apartment and "invited" Ms. Taylor out "on the porch" to "fight" with him. Ms. Taylor and Ms. Armstead went out

on the porch, but no fight ensued and defendant returned to his own apartment.

Thereafter, Ms. Taylor took Tracy to her apartment and called the police. Chicago police officers Michael McCollum and Medici testified that they responded to the call. When they arrived on the scene, Tracy was wearing a housecoat and she told them defendant had made sexual advances towards her after she had finished taking a shower or bath. Tracy was then taken to the police station. A short time later, Ms. Shirley Best, Tracy's grandmother, arrived at the apartment and was told by neighbors that Tracy had been taken to the police station. Ms. Best went to the station and talked with Tracy. She told Ms. Best that defendant had raped her. Ms. Best subsequently accompanied Tracy to the Wyler's Children Hospital where Tracy was examined by Dr. David Cline.

Dr. Cline testified that his examination of Tracy revealed abrasions on both her elbows and inner thigh, redness around her neck and eye and sperm cells in the lower portion of her vagina and cervix. Dr. Cline further testified that it would be very difficult to assess the age or type of sperm which "could live up to 48 hours in the area around the cervix." After her examination, the hospital released Tracy into the care of Ms. Best, with whom she lived for a short period of time.

Ms. Best testified that during Tracy's stay with her, she overheard Tracy's telephone conversation with another girl. In that conversation, Tracy said she hated defendant and that she was going to get even with him by saying that he raped her. When Ms. Best later questioned Tracy about this conversation, Tracy told her she said what she did because she did not want defendant in her house anymore and that she was going to do something to hurt him.

Defendant, too, was questioned briefly by the police after their arrival at Ms. Taylor's apartment. He subsequently was taken to the police station and interviewed by Chicago police officer James Cassidy. At that time defendant told him that Tracy had asked him to help her alter the shorts she was wearing and, in attempting to do so, defendant "began rubbing her crotch, she became excited and she took off her blouse," exposing her breasts. This resulted in a "wrestling match" during the course of which defendant "fondled Tracy's breasts, began to rub her vagina and inserted one finger in her vagina."

Thereafter, at the request of Officer Cassidy, Assistant State's Attorney David Borenstein interviewed defendant. Borenstein testified that defendant told him he had "played with [Tracy's] tits and her thi-

gamajig with his hand," but he did not put his penis into her vagina, have oral sex with her or remove his clothes during the incident. Borenstein also stated that although he took defendant's statement down "almost verbatim," he paraphrased portions of it. After reading the statement to defendant, defendant read it, made no corrections and signed his name at the bottom of and across the writing on both pages.

Defendant testified that although he signed the statement, it was not the same statement he orally gave to Borenstein and that he did not read it because he did not have his glasses with him at that time. Contrary to the version of the incident recorded in the statement, defendant asserted that Tracy came into the living room of the apartment after her mother and brother left and asked defendant for a needle and thread so she could sew up some pants. After he gave her the needle and thread, he later went into her room to see what she was doing. After a short conversation with her, he returned to the living room. Subsequently, Tracy came into the living room in her housecoat and "let it fly open," revealing she was naked underneath. She told defendant that, "I won't tell anybody if you don't tell." Defendant stated that in order to scare her, he told her, "If you want to play some funny games, *** I could show you what can really happen." He further stated that he then "grabbed her by her breasts and *** reached for her," grabbing her only for an instant. He then told her to take a dollar off the windowsill and to use it to take a bus to join her mother at a friend's house. Defendant also told Tracy he was going to tell her mother about the incident and then left the apartment to use a neighbor's telephone to call the police and his sister because, knowing how much Tracy hated him, he would have a better chance than if she called the police.

Cynthia Johnson and Joseph A., Tracy's 14-year-old brother, also testified on behalf of defendant. Ms. Johnson testified she was Tracy's best friend and that she had been with Tracy and her boyfriend on August 24, 1983, two days prior to defendant's arrest. On that occasion she and her boyfriend had gone with Tracy and her boyfriend to a vacant apartment. While there, Ms. Johnson saw Tracy and her boyfriend "having sex on the floor" in the bedroom. Shortly thereafter Tracy told Ms. Johnson that she was going to say that defendant had raped her. Ms. Johnson also testified that the following night, August 25, she saw Tracy with her boyfriend and Tracy later told her she again had had sex with her boyfriend so that she could say that defendant had raped her.

Joseph A. corroborated defendant's testimony concerning the

events of August 25, the day before the incident. Joseph stated that on that date Tracy and defendant had an argument. Tracy had been cursing defendant because he had taken $2 from her. Her mother told her to be quiet and, when Tracy continued, her mother attempted to punish her by striking her with a belt. During their struggle, Tracy kicked her mother in the stomach. Defendant, who had been out on the "porch" of the apartment, went into Tracy's bedroom where she and her mother were struggling. Tracy began screaming at him and said "she wanted to die." Defendant replied that if she wanted to die, he would help her. He then began shaking her by her shoulders, grabbed her around the neck, removed a screen from the window and threatened to throw her out of the window. Tracy held on to the bed and said she did not want to die. The altercation then ended. Joseph also testified that Tracy had told him that she did not like defendant from the very beginning of his marriage to their mother.

Based on the above, defendant was found guilty of the offense of indecent liberties with a child; the jury returned a not guilty verdict on a charge of deviate sexual assault.[1] This appeal followed.

## I

Defendant first argues that he was denied a fair trial when the trial court, as a sanction for what it deemed to be a discovery violation, refused to allow Gladys Echols, his wife and the mother of Tracy, to testify on his behalf. At the outset of his case in chief, defendant sought to call Ms. Echols as a witness. The State objected, claiming that Ms. Echols was not listed in either of defendant's two answers to discovery and, thus, it had no opportunity to interview her. Defendant argued that although he did not specifically list Ms. Echols in his answers, her name was incorporated into them by the inclusion of a statement to the effect that the defense may call any witness listed in the State's answer to discovery "or whose name may appear in the police reports." Ms. Echols' name appeared in the police report, designating her as the mother of the complaining witness, Tracy A. The court granted the State's motion to exclude Ms. Echols as a witness, refused defendant's request that it impose the alternative sanction of allowing the State time to interview her and denied defendant's subsequent motion for a mistrial. An offer of proof by defense counsel reveals that if Ms. Echols had been allowed to testify she would have described Tracy's hatred of defendant and would have

---

[1]Prior to trial, the State had nol-prossed charges of aggravated incest, sexual abuse of a child by a family member and unlawful restraint.

impeached her testimony concerning her daily activities and her relationship with her boyfriend.

Essential to the right of an accused in a criminal trial is his right to due process and his right to call witnesses on his own behalf. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) Any action by a trial court which restricts this right must be closely scrutinized. (410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) Here, although defendant's answers failed to specifically name Ms. Echols as a witness, the State was expressly advised that defendant reserved the right to call as a witness any person named in the police reports. Since Ms. Echols was named in the police reports, we believe the trial court's discovery sanction, which could have been cured by allowing the State time to interview her, was unwarranted.

However, in light of the overwhelming evidence of defendant's guilt, we find this error was not so prejudicial as to warrant reversal of defendant's conviction. (See *People v. Galindo* (1981), 95 Ill. App. 3d 927, 420 N.E.2d 773.) Although defendant was charged with deviate sexual assault and indecent liberties with a child, he was only convicted of the indecent-liberties charge. Section 11—4(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 11—4(a)(3)) defines the offense of indecent liberties with a child as follows:

> "(a) Any person of the age of 17 years and upwards commits indecent liberties with a child when he or she performs or submits to any of the following acts with a child under the age of 16:
>
> * * *
>
> (3) Any lewd fondling or touching of either the child or the person done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the person or both."

Under this section, physical contact with a victim's genitals is not essential to support a conviction for indecent liberties with a child (*People v. Allison* (1983), 115 Ill. App. 3d 1038, 452 N.E.2d 148), even kissing may constitute lewd conduct (*People v. Kirilenko* (1953), 1 Ill. 2d 90, 115 N.E.2d 297) and a victim's consent is irrelevant (*People v. Hernandez* (1980), 88 Ill. App. 3d 698, 412 N.E.2d 572). All that is necessary to establish the offense, in addition to the ages of the offender and the victim, is a lewd touching of the child or person with the intent to satisfy the sexual desires of either person or both.

■ Based on the foregoing, even if the factfinder were to discount the victim's story, defendant's own version of the incident and other testimony by the State's witnesses support his conviction. Spe-

cifically, defendant testified that in order to allegedly scare Tracy he told her, "[Y]ou want to play some funny games, \*\*\* I could show you what can really happen," and that he "grabbed her by her breasts and \*\*\* reached for her \*\*\* for an instant." Thus, defendant admitted the commission of the lewd act. Insofar as his intent at the time is concerned, we note that the mental element of this offense is ordinarily established by circumstantial evidence rather than by direct proof (*People v. Marchese* (1975), 32 Ill. App. 3d 872, 336 N.E.2d 795), and is a question for the jury whose function is to weigh the testimony and determine the credibility of witnesses (*People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317). Here, the State's witnesses testified that a "fight" occurred between defendant and Tracy; Tracy promptly alerted the neighbors and the police were called; Tracy had a swollen eye, was crying and "looked hysterical"; and later examination of Tracy revealed abrasions on both her elbows and inner thigh. The jury also heard testimony concerning defendant's signed statement and his statements to the police and assistant State's Attorney. Based upon a weighing of the credibility of the witnesses, we believe the evidence was sufficiently clear and convincing for the jury to conclude beyond a reasonable doubt (see *People v. Hamelin* (1979), 75 Ill. App. 3d 445, 394 N.E.2d 566) that defendant did more than merely grab Tracy's breasts for an instant and that his actions were intended to arouse or satisfy his sexual desires, rather than to "scare" her.

Moreover, we note that had Ms. Echols been permitted to testify, her testimony concerning Tracy's animosity towards defendant, and thus her motive to lie about the event, would only have gone to Tracy's credibility. In light of the verdicts finding defendant guilty of indecent liberties with a child and not guilty of deviate sexual assault, even without Ms. Echols' testimony the jury apparently did not believe Tracy's rape version of the incident. Finally, our review of the record indicates that Ms. Echols' testimony, that Tracy hated defendant, would have been cumulative to the testimony of Tracy, Ms. Best, Ms. Johnson and Joseph A. concerning this fact.

For the above reasons, therefore, we hold that the trial court's refusal to allow Ms. Echols to testify was harmless error.

## II

■ For reasons similar to those expressed above, we also reject defendant's argument that he was denied a fair trial when the trial court sustained the State's objection to his introduction of evidence, based upon the testimony of Ms. Best, concerning Tracy's reputation

for truth and veracity. Not only do we believe that any testimony on this issue would have been cumulative, we also note that defendant failed to preserve this asserted error for review with an offer of proof and we, therefore, are precluded from addressing this contention. See *People v. Gordon* (1980), 82 Ill. App. 3d 906, 403 N.E.2d 570.

## III

■ Defendant also argues that improper remarks by the State in closing argument resulted in a denial of his right to a fair trial. Specifically, he contends that the assistant State's Attorneys made numerous remarks to the jury based on their own personal beliefs, while also arguing facts not in evidence, and derogatory comments about defendant and his counsel. For example, defendant alleges that the State labeled his testimony as being the product of "his warped sense of values" and, at another time, remarked that "[the defendant] is obviously sick." Defendant also alleges that the State personally attacked defense counsel by remarking that, in reference to the testimony of Ms. Best, that defense counsel presented "a grandmother, that when they interviewed her, perhaps they put it in her mind about the conversation [between Tracy and an unidentified girl friend]," thus creating the inference that defense counsel suborned perjury. At another juncture, the State argued in the first person 11 times in two short paragraphs, stating, "I am," "I'm outraged," "I think," etc. The State also commented on police reports excluded by the court and the fact that Ms. Echols did not testify on behalf of defendant, being well aware the court precluded her from doing so as a discovery sanction. On the other hand, the State argues that the remarks objected to by defendant were either proper comment on the evidence and natural inferences therefrom or were invited by defense counsel.

Prosecutorial comments do not amount to reversible error where it cannot be said that any one of the comments or the totality of them resulted in substantial prejudice to the accused or that the verdict would have been different had the comments not been made. (*People v. Spann* (1981), 97 Ill. App. 3d 670, 422 N.E.2d 1051.) Here, we find that some of the State's remarks clearly were improper. However, we believe they were harmless in light of the overwhelming evidence of defendant's guilt (see *People v. Smith* (1984), 127 Ill. App. 3d 622, 469 N.E.2d 634) based on his own admission, that he "grabbed [Tracy] by her breasts and *** reached for her," and other evidence presented at trial. Moreover, the record discloses that the trial court adequately instructed the jury to disregard statements not based on

the evidence. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) We believe these instructions were sufficient to cure any possible prejudice resulting from the prosecutors' improper remarks in closing argument. (See *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339.) Accordingly, we hold that the State's improper remarks did not substantially prejudice defendant requiring reversal of his conviction.

## IV

■■ Defendant next contends that the trial court abused its discretion in sentencing him to a term of imprisonment rather than probation pursuant to section 5—6—1 of the Unified Code of Corrections (the Code) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—6—1), which provides, in pertinent part:

"(a) Except where specifically prohibited by other provisions of this Code, the court shall impose a sentence of probation or conditional discharge upon an offender unless, having regard to the nature and circumstance of the offense, and to the history, character and condition of the offender, the court is of the opinion that:

(1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or

(2) probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—6—1(a)(1), (2).)

Although the crime of indecent liberties with a child is a Class 1 felony, it is a probational offense. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.) Defendant asserts that the trial court did not consider placing him on probation due to his counsel's misinformation to the court at the sentencing hearing that "considering he [defendant] was found guilty of a Class 1, which does not admit a probation, the only thing under the statute that I could recommend is the minimum time." Defendant further contends that a sentencing court "must enumerate for the record its reasons for imposing a term of imprisonment rather than giving the preferred disposition of probation," which the court allegedly failed to do.

Although the record must indicate that the trial judge "is of the opinion that imprisonment is necessary for the protection of the public or that probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice[,] [s]ubstantial compliance with section 5—6—1 may ex-

ist" even if the trial judge has not specifically stated either reason. (*People v. Cox* (1980), 82 Ill. 2d 268, 281, 412 N.E.2d 541.) Where the record discloses substantial compliance, a reviewing court may alter a sentencing judge's disposition only upon a finding of an abuse of discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 150, 368 N.E.2d 882.

■ In the instant case, there is nothing in the record to indicate that the trial court was unaware of the fact that indecent liberties with a child was a probational crime. To the contrary, during the sentencing hearing the State specifically requested that defendant be sentenced to the penitentiary, indicating that the State was aware that defendant could receive probation. We cannot believe that the experienced trial judge was any less aware of this fact, especially in light of the State's indirect "reminder" to the court in the form of its request for a term of imprisonment. In addition, the trial judge's awareness of alternate sentences with respect to a Class 1 felony is further indicated by his comments, after defendant and his wife testified at the sentencing hearing, that he could have given defendant an increased penalty under a Class 1 felony but would not do so because he felt he had to "honor the jury's verdict of the not guilty of the Class X felony." The trial judge also acknowledged that defendant's testimony to a great extent at the sentencing hearing was the same as that which had already been considered by the jury and stated that he believed the jury had shown "great temperance" towards defendant in only finding him guilty of indecent liberties with a child. These comments demonstrate the judge's thorough consideration of the evidence presented at trial, as well as the aggravating and mitigating factors presented at the sentencing hearing which included comments by the judge about his concern over defendant's additional "brutal" disciplinary habit of "beating" Tracy with a belt whenever she failed to respond to his orders. We conclude, therefore, that the trial judge's findings demonstrate a reasoned opinion that defendant's conduct was of such a serious nature as to preclude probation.

■ Additionally, we believe that the judge's imposition of the $2,000 fine, the amount of defendant's cash bail deposit, reflects his opinion of the serious nature of defendant's victimization of Tracy and his determination to impose a further punishment. (See *People v. Polk* (1973), 10 Ill. App. 3d 408, 294 N.E.2d 113, in which our court discussed the serious nature of the crime of indecent liberties with a child, as evidenced by the legislature's promulgation of the penalty provision under section 11–4 of the Code authorizing imprisonment in the penitentiary.) We also note that defendant's sentence

was within the statutory framework of from 4 to 15 years' imprisonment (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4)).

Accordingly, we find that the trial judge substantially complied with the provisions of section 5—6—1 of the Code and, therefore, did not abuse his discretion in sentencing defendant.

## V

■ Defendant's final argument is that the trial court abused its discretion in fining him $2,000. Specifically, defendant asserts that in the absence of an affirmative reason in the record justifying the imposition of a fine or a determination by the trial court as to whether defendant has the financial ability to pay one, the imposition of the fine was an abuse of discretion by the court.

We reject defendant's argument that the trial court was required to specify an affirmative reason for imposition of the fine. Where a trial judge specifies reasons sufficient to support the imposition of a sentence, he need not specify separate or distinct reasons for imposing a fine; "when a fine and imprisonment are imposed, they are imposed as one sentence, with the reasons specified supporting the entirety." (*People v. Bishop* (1980), 81 Ill. App. 3d 521, 524, 401 N.E.2d 648.) In the instant case, as previously stated in point IV of this opinion, defendant's sentence was supported by sufficient reasons by the trial judge. Accordingly, the trial judge was not required to specify any separate or distinct reasons for imposition of the fine.

■ On the other hand, we have determined that the trial court lacked sufficient facts to determine defendant's financial ability to pay the fine imposed pursuant to section 5—9—1(d)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—9—1(d)(1)). The presentence report indicated that defendant was 39 years old at the time of sentencing and in good health, that he was unemployed at the time and had been for over two years during his three-year marriage to Tracy's mother, that he was on a general-assistance grant with his wife under which the family received $302 per month plus $184 in food stamps, and that he had no outstanding debts except $50 per month for rent which he paid out of the family's general-assistance allotment. The report did not reveal, however, whether defendant had any assets or other sources of income, nor does the record indicate otherwise. We further note that although defendant posted a $2,000 cash bail, his ability to do so does not necessarily indicate he has the financial ability to pay the fine since the money may have been borrowed or paid by friends or relatives. (See *People v. Morrison* (1983), 111 Ill. App. 3d 997, 444 N.E.2d 1144.) We also note that the Unified

Code of Corrections discourages imposition of a fine where it would "hurt" a defendant's dependents more than the defendant himself (Ill. Ann. Stat., ch. 38, par. 1005—9—1, Council Commentary (Smith-Hurd 1982)). Under the circumstances, therefore, we must vacate the fine and remand the cause to the trial court for the limited purpose of conducting a hearing to determine defendant's ability to pay a fine and the amount thereof.

■■■ Finally, we believe it is necessary to briefly comment on the State's argument that, pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, to the extent of the cash bail deposited by a defendant, *he is not presumed to be indigent for the purpose of paying a fine or costs.* The State appears to suggest that even if it were determined that a defendant was otherwise financially unable to pay a fine, payment of it could nonetheless be exacted from his cash bail deposit. Our supreme court, however, did not address this presumption issue, which actually was established by this court in *People v. Nicholls* (1977), 45 Ill. App. 3d 312, 359 N.E.2d 1095. Instead, it held that pursuant to section 110—7(h) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 110—7(h)), once a judgment for a fine or court costs is entered a cash deposit shall be applied to the payment of the judgment and *it is irrelevant whether the deposit is the actual property of the defendant since one of the purposes of the deposit is satisfaction of the judgment without the necessity of having an execution issue and a levy made upon the deposit.* Contrary to the State's argument, we do not interpret this holding to relieve a trial court from first determining whether a defendant has the financial ability to pay a fine pursuant to section 5—9—1(d) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—9—1(d)). To do so would contravene the intention of the legislature in promulgating section 5—9—1(d). Accordingly, we hold that section 110—7(h), providing for the use of a cash bail deposit to pay a judgment for a fine, only applies *after* the trial court has determined that a defendant has the financial ability to pay a fine pursuant to section 5—9—1(d).

For the foregoing reasons, therefore, the judgment of the circuit court of Cook County is affirmed in all respects except for the issue of imposition and the amount of a fine which is to be determined at a hearing on remandment.

Affirmed and remanded in part.

SULLIVAN, P.J., and LORENZ, J., concur.