THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRENT WHITE, Defendant-Appellant.

First District (6th Division) No. 1—91—0192

Opinion filed December 30, 1993.

Rita A. Fry, Public Defender, of Chicago (Ira Sheffey, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Cory J. Pollack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Defendant, Brent White, was charged by indictment with armed robbery, home invasion, and residential burglary. Following a jury trial, defendant was found guilty of armed robbery and home invasion in violation of sections 12—11(a)(1) and 18—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, pars. 11(a)(1), 18—2(a)). He was thereafter sentenced by the court to seven years in the penitentiary. Defendant appeals his conviction pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

Defendant raises the following issues for our review: (1) whether the trial court committed reversible error by prohibiting a defense witness from testifying who was not disclosed to the State in pretrial discovery; and (2) whether the trial court improperly admitted the testimony of a State witness who stated that defendant had threatened him with a gun on the day following the robbery.

Anthony Brown testified that in 1984 he had been the victim of a shooting accident that left him partially paralyzed on his left side and blind in his right eye. As a result of the accident, Brown received a large cash settlement.

On July, 3, 1989, in the early afternoon, Brown and Darryl Castle visited the Indiana State line to purchase fireworks for the coming July 4 holiday. After buying the fireworks, Brown went to the home of Freida Grayson which was located down the block from his apartment. Brown had known Freida Grayson from the time he was born and planned to celebrate the holiday at her house. During the afternoon, numerous people gathered at the house to drink beer and celebrate the impending holiday, including Freida Grayson, Jerome Faulkner, Ricky Brown, Darryl Castle, and Catrice Grayson.

Later on that July 3 evening, Brown observed Latawan Grayson and defendant arrive at the house. Brown had never met defendant prior to this gathering. Brown testified that he had been drinking beer at the party for several hours before going home between 2:30 and 3:30 a.m on July 4.

When Anthony Brown and Jerome Faulkner left Freida Grayson's house, they walked down the block to Brown's apartment building. Brown had noticed that defendant had left the party 15 minutes earlier. Prior to entering the building, Catrice Grayson met Brown outside and accompanied him upstairs to his apartment. Jerome Faulkner continued to walk down the street and did not go inside Brown's building. A few minutes after Brown and Catrice Grayson had been in the apartment, someone knocked on the door and asked whether Tricia (Catrice) was in the apartment. The person said that it was Tawan, but Brown could not identify the voice. Without opening the door, Brown responded that Tricia was in the apartment and she would be leaving shortly.

A few minutes later, when Catrice was ready to leave, Brown opened his apartment door and observed defendant standing in the hallway. Brown testified that defendant was holding a rifle and pointing it at Brown's head. He indicated, however, that the gun's barrel was not the full length of a rifle. Defendant ordered Brown to back up inside the apartment and to lie down on the bed. Brown testified that defendant threatened him, telling him that "I can kill

you easy because I'm already high." During the incident, Catrice Grayson remained standing inside the apartment and did nothing. On cross-examination, Brown testified that he could not get a good height description of defendant at the time because defendant made him lie on the bed and because he was nervous. He also testified that he could not be sure whether the defendant had a moustache, although he did state that the robber did not have a beard, did not wear glasses during the robbery and had short black hair.

After Brown was forced to lie on the bed, defendant pointed the weapon between Brown's legs and asked him for his gold rings and wallet. Defendant removed two gold rings from Brown's fingers and took $641 from Brown's wallet. Defendant also removed the coins from Brown's front pocket saying "[w]e take change, too." After taking the rings and money, defendant told Brown to "get a good look at me because I live in the neighborhood, and I be seeing you around." Before leaving the apartment, defendant began searching for Brown's VCR. Brown heard Catrice Grayson say "[w]ell, you just going to have to shoot me because I'm walking out of here." Catrice Grayson then left Brown's apartment and defendant quickly followed her.

After defendant and Catrice left his apartment, Brown testified that he proceeded two doors down the hall to his brother's apartment. Brown told his brother, Lamont, what had happened and Lamont called the police. Lamont made the call from the telephone located in the second-floor hallway of the building because neither he nor Brown had a telephone in their respective apartments. After the police failed to arrive, Lamont contacted the police a second time, but police again did not respond to the scene.

Later that morning, at approximately 8:30 a.m., Brown returned to Freida Grayson's house. Brown had recognized defendant as one of the people who had attended the party at Freida Grayson's home on the previous evening, but he did not know defendant's name. Brown asked Freida if she knew the name of the person at the party wearing the blue sweat jacket and standing with Latawan Grayson. Brown testified that pursuant to that discussion, Freida Grayson supplied him with defendant's name.

At approximately noon, Brown was taken to the police station by Violet Grayson where he reported the robbery to the police. A few days after he reported the incident, Brown was contacted by Detective John Duffy and spoke with him about the crime. On July 13, 1989, Brown met with Detective Duffy on the street in front of his apartment building where the detective showed Brown several photographs. He indicated that he recognized defendant in one of the

photographs and noted that the photograph showed defendant to have a bandage on his head. On July 23, 1989, Brown visited the Area 2 violent crimes office on 111th Street, where he was able to positively identify defendant in a lineup as the person who had robbed him.

Detective John Duffy testified next for the State. On July 6, 1989, Detective Duffy was assigned to investigate the robbery and home invasion of Anthony Brown. Detective Duffy reviewed the report of the incident that had been previously prepared and noticed that it listed defendant's name as the offender. Detective Duffy obtained a photograph of defendant and contacted Anthony Brown to make arrangements to meet with him. On July 13, 1989, the detective met with Brown on the street across from Brown's apartment building. At the meeting, Detective Duffy showed Brown nine black-and-white photographs. Duffy testified that Brown recognized defendant in one of the photographs but was not able to make a positive identification because defendant's picture showed bandages on his head.

After meeting with Brown, Detective Duffy spoke with Freida Grayson and June Dean about the occurrence. June Dean was the mother of defendant's girlfriend, Franzetta Dean. After defendant was identified, Detective Duffy learned that defendant's girlfriend had gone to Battle Creek, Michigan. Pursuant to this conversation, the detective contacted the Battle Creek police department and advised them that defendant had two outstanding warrants in Chicago and could possibly be located at Franzetta Dean's home in Battle Creek. On July 15, 1989, Detective Duffy was informed that defendant had been arrested in Battle Creek and that he would be extradited to Cook County jail on July 22.

On July 23, 1989, Detective Duffy conducted a lineup at the Area 2 violent crimes office. During the lineup, Anthony Brown positively identified defendant as the person who had committed the crime. Detective Duffy testified on cross-examination that defendant was the only person who appeared in both the photographic and in-person lineups.

Darryl Castle testified next for the State's case in chief. On July 3, 1989, at approximately 11 a.m., Anthony Brown visited Castle at his home and asked him to accompany him to the Indiana State line to purchase fireworks for the July 4 celebration. Thereafter, Castle and Brown drove to Indianapolis Boulevard and purchased fireworks for the children in the neighborhood. After buying the fireworks, the two returned to their neighborhood.

At approximately 11:30 p.m. that evening, Castle visited Freida Grayson's house, where he met with Brown and the others who were

attending the gathering. While at Freida's house, Castle told Brown that July 4 was his birthday. At 12 a.m., Brown approached Castle and gave him a $100 bill from his wallet as a birthday present. After receiving the gift, Castle stayed at the party for about 15 minutes, but he did not see defendant at the party that night.

On July 4, 1989, at approximately 11 a.m., Castle met with Brown and learned about what had happened earlier that morning. Brown told Castle that defendant had robbed him with a shotgun. Castle had known defendant for four years prior to the crime and he told Brown that when he saw defendant, he would talk to him about it. At approximately 4:30 p.m., Castle saw defendant on the street at 85th and Buffalo. Castle approached defendant on the street and confronted him about the crime. Defendant told Castle that the incident was not any of his business. After the two exchanged words, defendant walked into an alley behind his girlfriend's house and returned with a rifle. Castle testified that defendant pointed the weapon at him and threatened him. Castle was holding his eight-month-old son at the time, and when he refused to put his son down, defendant left the scene. Castle did not report the incident to the police because he had hoped that he would meet defendant again on his own.

Freida Grayson testified next. She stated that on July 3, 1989, she held a gathering in the backyard of her house. At approximately 9 p.m., Freida saw defendant in front of her house. Freida left the party at approximately 11 p.m. and went inside.

On July 4, 1989, at approximately 8:30 a.m., Anthony Brown returned to Freida's house. Brown told Freida that he had been robbed the previous evening and his money and rings were taken. During direct examination, Freida initially told the prosecutor that Brown had told her that he didn't see anyone. After the prosecution reminded Freida about the meeting that had taken place in the prosecutor's office prior to her trial testimony, however, Freida stated that Brown asked her the name of the man wearing the blue, white and black jacket that had attended the party the previous night. She stated that she told Brown that the man he was referring to was defendant.

On cross-examination, Freida Grayson testified that when she saw Brown at the party, he was drunk. She also testified that during the evening, she heard Jerome Faulkner and Ricky Brown talking about robbing Brown. On redirect examination, Freida testified that she was subpoenaed to testify. She stated that she did not tell anyone about the conversation between Jerome Faulkner and Ricky Brown. Freida testified that even after police visited her and showed her

photographs relating to the crime, she did not tell them about the conversation between Jerome and Ricky.

The State continued its case in chief with the testimony of Catrice Grayson, Freida's niece. Catrice stated that she attended the party on July 3, 1989. She testified that she saw Anthony Brown and defendant at the party.

After the party, Catrice Grayson accompanied Brown to his apartment. While in the apartment, someone knocked on the door and asked for her. Brown responded by telling the voice that she would be outside shortly. After approximately 15 minutes, Brown opened the door to let Catrice out. When the door opened, Catrice saw defendant standing outside the doorway holding a shotgun. Catrice testified that defendant told Brown to give him his money and his rings. She observed defendant remove Brown's rings, take the money from Brown's wallet and take Brown's VCR. Catrice then told defendant that she did not want to have anything to do with the robbery and she left Brown's apartment.

Later that morning, after the crime had occurred, Catrice saw defendant walking down the street a block away from Brown's apartment. Catrice testified that defendant was holding a shotgun in his hands.

During cross-examination, Catrice Grayson testified that she was currently under arrest on contempt charges for failing to previously attend court in the case. She stated that she had been drinking beer and wine coolers at the party until after 2 a.m. She also testified that she had five pending felony drug cases against her. On redirect, Catrice testified that she was not promised anything by the State's Attorney's office or the police in exchange for her testimony. She stated that it was not until September, approximately two months after the incident, that police spoke with her.

Detective Duffy was recalled by the State to rebut part of the testimony of Freida Grayson. Detective Duffy testified that when he visited Freida Grayson on July 15, 1989, she told him that the morning after the crime, Brown came to her home and described defendant to her. Brown gave Freida the age, height and weight of defendant, as well as a description of the clothing defendant had on the night of the crime. Pursuant to the description, Freida told Brown the name of defendant. The detective also testified that he was present prior to trial during a conversation between Freida Grayson and the prosecutor. During that pretrial meeting, Freida Grayson described the events of the incident, but at no time did she say that Brown had told her he could not identify the person who had robbed him. Freida also never disclosed that she had overheard two other men talking about robbing Brown that night.

After the State rested its case in chief, defense counsel advised the trial judge that she had found an additional witness the previous night and she wanted to call the witness to testify. Defense counsel told the trial judge that the witness, Carolyn Maxwell, had been present at Freida Grayson's house on the morning after the robbery when Brown and Castle spoke with Freida. Maxwell would testify that Brown said he did not see the person who had robbed him. Defense counsel argued that since the State was allowed to recall Detective Duffy to rebut Freida Grayson's testimony, defendant should be allowed to call Carolyn Maxwell. The trial court responded by stating the following:

> "That's not the same situations as you popping up at twenty minutes to three today, at the close of the State's case with some witness you found last night who is going to say she was present."

The trial court denied defendant's request to call Carolyn Maxwell. The defense then presented its case in chief.

Officer Daniel Sheehan testified that on July 4, 1989, at approximately 12:45 p.m., Anthony Brown visited the fourth district police station. Brown told Officer Sheehan that he had been robbed and that the assailant was approximately 5 feet 7 inches, weighing 170 to 180 pounds, and was approximately 26 years old. Officer Sheehan testified that he prepared the initial police report concerning the robbery and home invasion.

Following Officer Sheehan's testimony, the defense put on Mrs. Bertie B. Dean to testify as an alibi witness. Mrs. Dean testified that she knew defendant as her granddaughter's boyfriend. On July 4, 1989, Mrs. Dean telephoned Battle Creek, Michigan, to speak with her family. She testified that during that phone conversation, she spoke with defendant for approximately five minutes. During cross-examination, Mrs. Dean testified that she did not know whether defendant was in Chicago on July 3 or July 4 of 1989. On re-cross, Mrs. Dean testified that Franzetta Dean and defendant were in Chicago sometime prior to the crime.

Defendant himself testified that he lived in Battle Creek, Michigan, and was 19 years old. Using a tape measure and full-scale figure, defendant's attorney had defendant stand in front of the jury and attempted to establish for the jury that defendant was approximately 6 feet 1 inch tall. The State objected, stating that the figure indicated that defendant was "at least an inch shorter than five, seven." The trial court noted that the jurors had made their own observation. Defendant's attorney responded "I'm sure the ladies and gentlemen have seen it."

Defendant stated that he, his girlfriend, and his girlfriend's

grandmother visited Chicago from June 28 to July 3, 1989. They traveled to and from Chicago by bus, leaving on June 28 and returning to Battle Creek on July 3, 1989, at 3:30 p.m. Defendant testified that he was not in Chicago on July 4. Defendant also testified that he did not drive a car from Battle Creek to Chicago because he did not know how to drive.

On July 4, 1989, while in Battle Creek, defendant talked with Bertie Dean on the telephone. Defendant testified that he was 6 feet or 6 feet 1 inch tall and weighed approximately 183 to 185 pounds in July of 1989. Defendant also testified that he was arrested and charged with unlawful possession of a stolen vehicle when he was 17 years old.

During cross-examination, defendant stated that he weighed 160 or 150 pounds when he was arrested in 1988. Defendant also testified he was driving a car when stopped by police in June of 1989 in Battle Creek. Lastly, defendant testified that when he visited Chicago between June 28 and July 3, 1989, he never saw Catrice Grayson, Freida Grayson or Darryl Castle.

After defendant testified, defense counsel again made an offer of proof as to the testimony of Carolyn Maxwell. Defense counsel stated that if Carolyn Maxwell was called to testify, she would say that on July 4, 1989, at approximately 10 a.m., she was in the backyard of Freida Grayson's house when Brown and Castle arrived. She would testify that, at that time, she heard Anthony Brown say that he could not identify the person who had robbed him. The trial court denied defendant's motion, stating:

> "This matter has been put before the court at an earlier time, and I have ruled for two reasons: One, the sum and substance that has been indicated and the offer of proof has been testified to by Freida Grayson earlier in this trial.
>
> Further, the other—so therefore the court sees this as cumulative, not really a material issue.
>
> Further, I would indicate this is November 13th. The State rested this morning, and this witness counsel indicated that they had discovered last night, and therefore this witness was not included in the discovery nor the list of witnesses that was read to the jury *** but if the witness's proffered testimony had been something other, in this court's view, other than cumulative, I would have seriously considered allowing that witness to testify, assuming the State were given the opportunity to interview this witness.
>
> But I don't feel that this testimony is anything other than cumulative. That evidence is already before the jury. *** But for all of these reasons this court feels this witness has not been

brought forth timely and does not have sufficient material testimony to add such that it's my feelings it would any way be pivotal for the jury's deliberation."

Following the court's ruling, the defense rested its case in chief. In rebuttal, the State offered into evidence the certified copy of defendant's prior conviction for possession of a stolen vehicle in September 1988. Defendant was subsequently convicted by the jury of armed robbery and home invasion.

Defendant first argues that he was denied a fair trial when the court prevented Carolyn Maxwell from testifying. The Supreme Court has indicated that the right to present witnesses is fundamental under the United States Constitution and is essential to due process. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 302, 35 L. Ed. 2d 297, 308, 312, 93 S. Ct. 1038, 1045, 1049.) A defendant's right to present witnesses in his defense is not absolute, however. For example, the trial court has the power to exclude cumulative or repetitive testimony, and the extent to which such evidence is admitted is recognized to be within the discretion of the trial court. (*People v. Frazier* (1984), 129 Ill. App. 3d 704, 711, 472 N.E.2d 1183.) A reviewing court will not interfere with an exercise of such discretion absent a showing of abuse prejudicial to the defendant. *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165; *People v. Thomas* (1979), 72 Ill. App. 3d 186, 389 N.E.2d 1330.

Moreover, Illinois Supreme Court Rule 413(d)(i) requires that a defendant disclose prior to trial a list of witnesses that defendant intends to call at trial. (134 Ill. 2d R. 413(d)(i).) Failure to comply with this disclosure requirement subjects defendant to possible sanctions, including the exclusion of undisclosed witnesses in an appropriate case. (134 Ill. 2d R. 415(g); *People v. Morgan* (1986), 112 Ill. 2d 111, 135, 492 N.E.2d 1303; *Partee*, 157 Ill. App. 3d at 252.) Again, the trial court's decision in this regard is generally a matter within its discretion and the court's decision will not be reversed absent a showing of prejudice or surprise. *Partee*, 157 Ill. App. 3d at 252; *People v. McKinney* (1983), 117 Ill. App. 3d 591, 453 N.E.2d 926.

There is no precise formula for resolving alleged conflicts between State rules of procedure or evidence and a defendant's fundamental right to present witnesses in his defense. It is clear, nonetheless, that this question involves a balancing of interests between the defendant's rights and other important policy considerations. *Taylor v. Illinois* (1988), 484 U.S. 400, 414, 98 L. Ed. 2d 798, 814, 108 S. Ct. 646, 656.

In *Perry v. Rushen* (9th Cir. 1983), 713 F.2d 1447, for example, the court made the following relevant observation:

"[B]oth the defendant and the state have important and legitimate interests; both must be evaluated and weighed. The exclusion of significant defense evidence implicates constitutional values. When due process issues are presented, the court must balance the importance of the evidence against the state interest in exclusion. In evaluating the significance of the evidence, the court should consider all of the circumstances: its probative value on the central issue, its reliability, whether it is capable of evaluation by the finder of fact, whether it is the sole evidence on the issue or merely cumulative, and whether it constitutes a major part of the attempted defense. The weight of the state's interest likewise depends on many factors. The Court must determine the purpose of the rule, its importance, how well the rule implements this purpose, and how well the purpose applies in the case at hand. The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, in excluding unreliable or prejudicial evidence." *Perry*, 713 F.2d at 1452-53.

The same basic analysis was applied in the seventh circuit in *United States ex rel. Enoch v. Hartigan* (7th Cir. 1985), 768 F.2d 161, 163. In *Enoch* the court noted that the principal reason for Illinois' witness-notice rules is the prevention of surprise to the opposing party, not punishment of the proponent of the evidence for mere technical errors or omissions. (*Enoch*, 768 F.2d at 163; See also *People v. Whalen* (1992), 238 Ill. App. 3d 994, 605 N.E.2d 604; *Alicea v. Gagnon* (7th Cir. 1982), 675 F.2d 913, 924.) The proper factors to be considered before witness preclusion is employed are the effectiveness of a less severe sanction, the materiality of the testimony to the outcome of the case, prejudice to the other party caused by the testimony, and evidence of bad faith in the violation of the discovery rules. *Enoch*, 768 F.2d at 163; *Whalen*, 238 Ill. App. 3d at 999.

When the exclusion of evidence is employed by the trial court, that decision will be closely scrutinized on appeal. (*People v. Echols* (1986), 146 Ill. App. 3d 965, 972, 497 N.E.2d 321; *People v. Foster* (1986), 145 Ill. App. 3d 477, 480, 495 N.E.2d 1141.) It is obvious that the exclusion of evidence must not encroach upon defendant's right to a fair trial. *People v. Lewis* (1988), 165 Ill. App. 3d 97, 518 N.E.2d 741.

■ In this case, however, we conclude that defendant was not denied due process or a fair trial by the trial court's ruling. Our conclusion is based principally upon our determination that the testimony offered by defendant was cumulative to evidence already admitted into evidence and ultimately immaterial to the outcome of the case. Thus, even if we were to conclude that the trial court improperly denied the admission of Maxwell's testimony, we would

find this decision to have constituted harmless error. See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 434, 539 N.E.2d 1172; *People v. Crews* (1988), 122 Ill. 2d 266, 288, 522 N.E.2d 1167. See also *Echols*, 146 Ill. App. 3d at 972-73 (exclusion of defense witness as sanction for discovery violation amounted to harmless error in light of overwhelming evidence of defendant's guilt).

At trial, Anthony Brown identified defendant as the man who robbed him. He testified in detail as to how defendant entered his room, stole his money and jewelry, placed a gun at his crotch and threatened to kill him. He testified that defendant said to him "get a good look at me because I live in the neighborhood, and I be seeing you around." On cross-examination defendant's lawyer established that Brown was blind in one eye and may have been drunk during the robbery.

Anthony Brown was not the only eyewitness to the robbery, however, and there is additional circumstantial evidence to indicate that the defendant committed the crime charged. Catrice Grayson also positively identified defendant as the person who robbed Brown. Unlike Brown, who had not known defendant before the robbery, Catrice testified that she had known him for more than four years. While defendant claimed that he was in Michigan at the time of the offense, all of the witnesses in Chicago on July 3 or 4 indicated that they were with him at Freida Grayson's party and/or saw him on the street the following day.

Freida Grayson testified that Brown came to her house the morning after he had been robbed and stated that "he didn't see anyone." In defendant's offer of proof, defendant's counsel stated that Carolyn Maxwell would testify, if allowed, that she was in Freida Grayson's back yard on the morning of July 4, 1989, when she heard Brown and Darryl Castle tell Freida that Brown had been robbed the night before. According to Maxwell, Brown said "I didn't see the person that robbed me." This proffered testimony is simply identical to Freida Grayson's testimony and was clearly cumulative. After reviewing all the evidence we simply do not believe the jury would have reached a different result had Carolyn Maxwell been allowed to testify.

Defendant next argues that he was denied a fair trial by the court's denial of his motion to exclude testimony from the victim's friend Darryl Castle regarding an encounter with defendant in the afternoon following the robbery. Castle testified that he was walking with his eight-month-old son in his arms when he saw defendant on the street near the scene of the crime. Castle stated that he asked de-

fendant about the robbery and told defendant that, had he asked Brown for the money, Brown would have given it to him if defendant needed it. Castle testified that defendant then indicated that it was "none of [Castle's] damned business." Castle then testified that the two "had some words." When Castle threatened to beat defendant up, defendant went into a nearby alley and retrieved a rifle. Defendant is then alleged to have threatened Castle with the gun as Castle held the baby. When defendant told Castle to put the baby down, Castle refused and defendant eventually walked away.

Defendant claims that this portion of Castle's testimony should have been excluded because it was offered only to unfairly prejudice the jury against him. The State responds that Castle's testimony was relevant and admissible for purposes other than to prove defendant's bad character.

Evidence of collateral crimes, or any bad act, is inadmissible if relevant merely to establish a defendant's propensity to commit the crime charged. (*People v. Illgen* (1991), 145 Ill. 2d 353, 583 N.E.2d 515; *People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238; *People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288.) While relevant, such evidence is recognized to overpersuade the jury, which may convict the defendant only because it believes he or she is a bad person deserving of punishment. (*Lindgren*, 79 Ill. 2d at 137.) Evidence of prior bad acts is admissible, therefore, for any purpose other than to show defendant's propensity to commit crime and so long as that evidence is not unduly prejudicial. (*Illgen*, 145 Ill. 2d at 365, citing *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821; *People v. Evans* (1988), 125 Ill. 2d 50, 82-83, 530 N.E.2d 1360.) When evidence of other crimes is offered by the State against a defendant, the trial court must "weigh its probative value against its prejudicial effect [citation], and may exclude the evidence if its prejudicial effect substantially outweighs its probative value." *Illgen*, 145 Ill. 2d at 365.

Defendant argues that the confrontation between defendant and Castle is inadmissible as the possession of a gun by defendant, a convicted felon, constitutes a criminal act which the jury should not have considered. Defendant argues that defendant's conduct the day after the robbery "added nothing of probative value" to the issues of the trial. Defendant also argues that the prejudicial effect of this testimony was "devastating."

■ There can be no doubt that the conduct described by Castle's testimony has the tendency to impermissibly draw attention to defendant's character. As defendant argues, Castle's testimony portrayed defendant as "a man who ran around the streets of Chicago with rifle in hand, ready to rob or settle disputes in the most violent

way possible." As the State responds, however, Castle's testimony was otherwise admissible for several reasons, the most significant of which was to show that defendant had access to a weapon similar to the one described by Anthony Brown and Catrice Grayson and to disprove defendant's claim that he was in Michigan on both July 3 and July 4.

We again emphasize that the admissibility or exclusion of evidence is properly a matter within the sound discretion of the trial court. The trial court's decision on such matters may not be overturned on appeal absent a clear abuse of that discretion. (*People v. Franklin* (1990), 135 Ill. 2d 78, 96, 552 N.E.2d 743; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 490, 485 N.E.2d 1292.) Here, the trial court weighed the arguments of the parties and held that the evidence would be admitted. We do not believe the trial court's decision in this regard was " ' "arbitrary, fanciful or unreasonable." ' " (*Illgen*, 145 Ill. 2d at 364, quoting *People v. M.D.* (1984), 101 Ill. 2d 73, 90, quoting *Peek v. United States* (9th Cir. 1963), 321 F.2d 934, 942.) Thus, the trial court acted within its discretion and cannot be said to have committed error.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.